893 P.2d 138

Teena A. CRAFT, Plaintiff–Appellant,

v.

Lawrence A. PEEBLES, M.D., Lawrence A. Peebles, M.D., Inc., Minnesota Mining and Manufacturing Company, McGhan Medical Corporation (a Delaware corporation), and McGhan Medical Corporation (a California corporation), Defendants–Appellants.

No. 16577.

Supreme Court of Hawai'i.

April 11, 1995.

290

Peter Van Name Esser of Peterson & Esser, Honolulu, for plaintiff-appellant.

John S. Nishimoto (Ronald D. Libkuman and Diane W. Wong of Libkuman, Ventura, Ayabe, Chong & Nishimoto, with him on the brief), Honolulu, for defendants-appellees Lawrence A. Peebles, M.D. and Lawrence A. Peebles, M.D., Inc.

David J. Dezzani (Margaret C. Jenkins and Sara Shirin Razani of Goodsill Anderson Quinn & Stifel, with him on the brief), Honolulu, for defendants-appellees Minnesota Min. and Mfg., Co. and McGahn Medical Corp.

Before MOON, C.J., and KLEIN, NAKAYAMA and RAMIL, JJ., and TOWN, Circuit Judge, in place of LEVINSON, J., recused.

MOON, Chief Justice.

Plaintiff-appellant Teena A. Craft appeals from the judgment entered pursuant to special verdict following a jury trial in the Third Circuit Court. In her action for personal injuries associated with breast prostheses she had surgically implanted into her body, Craft alleged: (1) negligence and lack of informed consent against defendant-appellee Lawrence Peebles, M.D. (Dr. Peebles); and (2) negligence, strict products liability, and breach of warranty against defendants-appellees Minnesota Mining and Manufacturing Company and its wholly-owned subsidiary, McGhan Medical Corporation [hereinafter collectively, McGhan].

Prior to trial, the circuit court had granted Dr. Peebles' motion for partial summary judgment, dismissing Craft's negligence claim against him. Craft subsequently withdrew her breach of warranty claim against McGhan. By special verdict, the jury found in favor of Dr. Peebles and McGhan on all of

the remaining issues. Specifically, the jury found that, although McGhan's implants were "defective or negligently manufactured," the implants were not the legal cause of Craft's injuries. For the reasons stated below, we affirm the trial court's judgment.

## I. BACKGROUND

### A. *Facts*

In 1980, while living in Florida, Craft decided to undergo breast augmentation surgery and sought the advice of several Florida physicians in order to determine the best method of breast implant insertion. Craft, who at the time was 21 years old, chose Dr. Dale Dubin, whose armpit-incision method of insertion minimized scarring or evidence of surgery. On March 25, 1980, Dr. Dubin performed the breast augmentation surgery, inserting two silicone gel-filled breast implants manufactured by McGhan into Craft's breast-cavity. Craft was pleased with the results of the surgery.

From 1980 to 1982, Craft made several visits to Dr. Dubin. The first few visits were for follow-up after the surgery, and the later visits concerned scar tissue build-up in her armpit area that eventually disappeared. In late 1982, she noticed that her right breast was hardening; however, she did not think the problem warranted a visit to the doctor. Also, in 1982, Craft moved to Kailua–Kona.

On October 9, 1984, Craft saw Dr. Peebles, a general surgeon in Kona, for treatment of an infected cyst on her back, a problem unrelated to her breast implants. She ad-vised Dr. Peebles of her breast augmentation, the hardness in her right breast, and that she was lactating. Craft testified that Dr. Peebles diagnosed her problem as a "capsular contracture"[1] and offered to "fix it right there" by a non-surgical procedure known as a "closed capsulotomy."[2]

Dr. Peebles testified that he gave Craft three options. He could: (1) perform a closed capsulotomy; (2) perform an open capsulotomy;[3] or (3) do nothing. Dr. Peebles testified that he warned Craft that the attendant risks of a closed capsulotomy were bruising, rupture of the implant, and recurrence of the capsular contracture. However, Craft denied having received such warnings. On October 9, 1984, Peebles performed a closed capsulotomy on Craft's right breast.

Dr. Peebles testified that, after placing Craft on her back, he placed his hands around her right breast and squeezed with enough pressure so that a "pop" of the capsular contracture could be heard. He described the audible "pop" as the sound of the capsule tearing. Craft, on the other hand, testified that Dr. Peebles' first attempt failed. On his second attempt, she heard a "pop" and then felt a painful sensation throughout her chest area. Dr. Peebles testified that he did not know whether this procedure ruptured Craft's right breast implant, but admitted that it was a possibility.

Dr. Peebles testified that he saw Craft on October 15, 1984, and January 2, 1985, regarding her complaints of tenderness and lumps on her right breast. Dr. Peebles diagnosed the lumps as "galactoceles," or collec-

---

1. Dr. Peebles testified that anytime a foreign substance is put in the body, including breast implants, the body forms a scar around it in an attempt to "wall it off." With a breast implant, the body lays a sheet of scar around the entire implant. The scar sometimes contracts, turning the implant into a very hard ball, and the woman will feel as if a baseball or a softball has been put under the skin of her chest. All women with breast implants experience contraction, but to many of them the contraction is cosmetically undetectable, and the breasts feel natural. Approximately ten to twenty percent of the women who have implants receive treatment for capsular contractions.

2. A "closed capsulotomy" is a non-surgical procedure in which the patient is placed on her back, and the physician places his or her hands around the breast, squeezing it to break the fibrous capsule around the implant. Performance of this procedure ideally restores suppleness to the breast. *See also Toole v. McClintock*, 999 F.2d 1430, 1431 n. 2, *reh'g denied*, 11 F.3d 169 (11th Cir.1993) (Noting that each of the experts in a breast implant case similar to the present case testified that "closed capsulotomy is often the best way to treat capsular contracture and that they perform the procedure on their patients many times each year.").

3. An "open capsulotomy" is a surgical procedure in which the doctor makes an incision into the breast in order to rupture the scar tissue surrounding the implant.

tions of milk in the breasts of women whose milk ducts clog during lactation. After further examining Craft on February 7, 1985, and March 4, 1985, Dr. Peebles determined that Craft's right implant had ruptured. He performed an open capsulotomy on Craft on April 2, 1985. Dr. Peebles removed about two-thirds of the ruptured shell of the implant from Craft's breast cavity and assumed the remaining one-third had dissolved. He also removed the loose silicone from the breast pocket and inserted a new breast implant also manufactured by McGhan. Craft remained under his care through June 6, 1985.

Dissatisfied with Dr. Peebles, Craft sought a new physician, and on September 28, 1985, began treatment with Dr. Robert Schulz, a plastic surgeon in Honolulu. Dr. Schulz testified that he saw Craft approximately twenty times and operated on Craft four or five times to remove silicone "granulomas"[4] in the areas surrounding her breasts.

Meanwhile, pursuant to Hawai'i Revised Statutes (HRS) chapter 671, Craft filed a claim against Dr. Peebles with the Medical Claims Conciliation Panel (MCCP). On July 7, 1987, after her case was heard and decided by the MCCP,[5] Craft filed a complaint in the present case in the Third Circuit Court pursuant to HRS § 671–16.

In September 1991, during a biopsy, Dr. Schulz noticed free-flowing silicone and determined that Craft's right breast implant had ruptured again. Although Dr. Schulz replaced Craft's right implant at that time, by 1992, Craft had all implants removed. Dr. Schulz testified, however, that Craft may need more treatment in the future because free silicone in the body "is a kind of a chronic problem."

During the period from 1984 through 1991, Craft had been treated by physicians other than Drs. Peebles and Schulz for problems unrelated to her breast implants. Dr. Clifton Arrington, a general practitioner, testified that he treated Craft for stress-related problems resulting from, among other things, her abusive husband, her arrests for possession of narcotics and theft, the death of her friend, and her recalcitrant daughter.

### B. Prior Proceedings

On June 5, 1992, Dr. Peebles filed a motion for partial summary judgment seeking dismissal of: (1) Craft's negligence claim, alleging that Craft failed to establish the applicable standard of care through expert testimony; and (2) Craft's claim for punitive damages, alleging that there was no indication that Dr. Peebles acted wantonly or maliciously. The trial court granted in part and denied in part Dr. Peebles' motion, dismissing Craft's negligence claim, but allowing Craft's punitive damages claim to continue.

On July 14, 1992, Craft filed four motions in limine to exclude: (1) unclothed photographs that depicted any part of her body other than her upper body; (2) evidence and testimony relating to her criminal record; (3) evidence and testimony of her alleged substance abuse; and (4) evidence and testimony of her allegedly abusive spouse. The trial court granted the motions with respect to the photos and the alleged substance abuse; however, because the evidence regarding her criminal record and her allegedly abusive spouse was "relevant to the claim of mental distress" or "mental anguish," the court denied the motion with respect to such evidence. We note, however, that during the trial, the court allowed the defense to cross-examine Craft regarding her alleged substance abuse, over objection.

McGhan filed a motion in limine to bar Craft's introduction of approximately 3,700 Product Field Reports (PFRs)[6] obtained from McGhan by Craft during discovery, and Craft filed a corresponding motion to permit

---

4. "[G]ranulomas ... are basically lumps that form in response to a foreign particle in the body." *Toole*, 999 F.2d at 1431.

5. Under HRS chapter 671, MCCP decisions are confidential.

6. McGhan urged its customers to make any and all complaints regarding its implants. PFRs are forms created by McGhan's employees for each customer complaint. The forms contain information which identify the specific breast implant, the customer, the nature of the complaint, an analysis of the complaint, and a summary of the follow-up investigation.

introduction of the PFRs. The trial court did not issue a ruling on this motion until the issue arose during trial. At trial, the court ruled that the PFRs could be relied upon by Craft's expert engineer, Thomas Talcott, to formulate his opinions, and that the defense could utilize the PFRs during cross-examination. The court, however, would not allow a wholesale admission of all 3,700 PFRs.

McGhan also filed a motion in limine to restrict Talcott's testimony to matters within his area of expertise so as to prohibit his opinions regarding medical problems associated with silicone breast implants. The motion was granted during the trial at which time the court ruled that Talcott could not testify about the "effects of silicone on the human body with regard to migration." [7]

The four-week jury trial commenced on July 21, 1992. On August 11, 1992, the trial court directed a verdict in favor of Dr. Peebles with respect to Craft's claim for punitive damages. The court also directed a verdict in favor of Dr. Peebles and McGhan with respect to Craft's claim for special damages. On August 14, 1992, Craft withdrew her breach of warranty claim against McGhan. Thereafter, the jury began its deliberations on the remaining issues of Craft's claim of lack of informed consent against Dr. Peebles and her claim for negligence and strict products liability against McGhan.

On August 17, 1992, the jury returned a special verdict in favor of Dr. Peebles and McGhan. The jury found that: (1) Dr. Peebles did not fail to obtain informed consent from Craft; [8] and (2) although McGhan's implants were "defective or negligently manufactured," the implants were not the legal cause of Craft's injuries.[9] Craft moved for a judgment notwithstanding the verdict (JNOV), which the trial court denied; this timely appeal followed.

On appeal, Craft challenges the court's rulings regarding: (1) her motions in limine; (2) Dr. Peebles' motion for partial summary judgment; (3) her expert witnesses' testimony; (4) certain jury instructions; (5) McGhan's PFRs; and (6) the special verdict. We address each area in turn.

## II. DISCUSSION

### A. Craft's Motions in Limine

Craft contends that the evidence of her: (1) criminal record; (2) family problems, including reference to her allegedly abusive spouse; (3) substance abuse; and (4) nude photographs were admitted in violation of Hawai'i Rules of Evidence (HRE) 401 [10] and 403.[11] On appeal, "different standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the partic-

---

7. "Migration" is the process by which free silicone travels through the body.

8. The specific question on the Special Verdict form (and the jury's response) stated:

   *Question One*
   A. Did Defendant Lawrence A. Peebles, M.D. fail to obtain informed consent from Plaintiff Teena Craft?

   _____Yes    x  No

   If you answer *no, do not* answer Part B, and go on to question two.
   If you answer yes, answer Part B below.

9. The specific question on the Special Verdict (and the jury's response) stated:

   *Question Two*
   A. Were the implants in this case defective or negligently manufactured?

    x  Yes    _____No

   If you answer no, do not answer Part B, and go on to question three.
   If you answer yes, answer Part B below.

B. Was the defective or negligently manufactured product a legal cause of injury to Plaintiff Teena Craft?

   _____Yes    x  No

10. HRE 401 provides:

    **Definition of "relevant evidence."** "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.
    (Bold emphasis in original.)

11. HRE 403 provides:

    **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
    (Bold emphasis in original.)

ular rule of evidence at issue." *Kealoha v. County of Hawai'i,* 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993). "When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard." *Id.* "However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a 'judgment call' on the part of the trial court." *Id.* at 319–20, 844 P.2d at 676.

### 1. Evidence of Craft's Criminal Record and Family Problems

In her opening brief, Craft refers to broad categories of allegedly irrelevant and prejudicial evidence that were admitted at trial regarding her criminal record and family problems; however, Craft fails to designate "where in the record the alleged error occurred and when it was objected to[,]" Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(4), and also fails to provide "a quotation of the grounds urged at the trial for the objection and the full substance of the evidence admitted[.]" HRAP 28(b)(4)(A). The reason for Craft's procedural violation is due, in part, to the fact that objections were never made below.

■ It is well settled that objections not raised or properly preserved at trial will not be considered on appeal. *MPM Hawaiian, Inc. v. Amigos, Inc.,* 63 Haw. 485, 630 P.2d 1075 (1981). However, relying on *Lussier v. Mau–Van Dev. Inc.,* 4 Haw.App. 359, 667 P.2d 804 (1983), Craft contends that she was not required to raise objections at trial with respect to her criminal record and family problems because the trial court had previously denied her motions in limine to exclude such evidence.

In *Lussier,* the Intermediate Court of Appeals (ICA) stated that:

a motion in limine is generally made before or at the beginning of a jury trial for a protective order against prejudicial questions, statements, and evidence. It serves the useful purpose of raising and pointing out before trial certain evidentiary rulings the court may be called upon to make during the course of trial.

. . . .

*Where the motion in limine is denied and during trial, opposing counsel attempts to ask the questions challenged in the motion or offer the prejudicial evidence covered therein, a proper objection at that time is necessary to preserve the error for appellate review. . . .*

An exception to this general rule is that objections need not be renewed if the prior ruling on the motion in limine amounted to an *unequivocal holding concerning the issue raised. . . .* Where a hearing was held, counsel presented legal arguments, and *the trial court ruled whether or not the challenged evidence would be admitted at trial,* there is no necessity of further objection to preserve such error for appeal.

*Lussier,* 4 Haw.App. at 393–94, 667 P.2d at 826 (emphasis added and citations omitted).

In *Lussier,* the plaintiff filed a motion in limine to exclude evidence of his "motives" in bringing suit, which the trial court denied. Plaintiff apparently failed to object when testimony regarding his "motives" was elicited at trial. The ICA held that the trial court "simply" ruled that the motion in limine was denied, *but did not rule on the admissibility of evidence,* and therefore a proper objection was necessary at trial to preserve the error for appellate review. *Id.* at 393–94, 667 P.2d at 826. The ICA reasoned that a motion in limine was not a ruling on the admissibility of evidence, but rather a "protective order against prejudicial questions, statements, and evidence." *Id.* at 393, 667 P.2d at 826; *see also Baxter v. Surgical Clinic of Anniston, P.A.,* 495 So.2d 652, 654 (Ala.1986) ("When the trial judge denies a motion to exclude evidence, made in limine, unless he clearly indicates to the contrary, it is the legal equivalent to an announcement that he reserves the right to rule on the subject evidence at the time of its offer, and is not a final ruling made in a pre-trial context."); *Romanek–Golub v. Anvan,* 168 Ill.App.3d 1031, 1040, 119 Ill.Dec. 482, 488, 522 N.E.2d 1341, 1347 (1988) (The requirement of a contemporaneous objection is not obviated by the motion in

limine because that motion "merely presents an issue of admissibility of evidence which is likely to arise at trial, in a pretrial setting[;] [a]s such, the order, like any interlocutory order, remains subject to reconsideration by the court throughout trial.").

■ Here, Craft maintains that the trial court's denial of her motions in limine amounted to an "unequivocal" holding concerning her criminal record and family problems; therefore, she was not obligated to renew her objections during trial. In other words, Craft maintains that the court's denial of her motions in limine became the "law of the case," obviating the necessity for renewed objections during trial. However, the pretrial in limine rulings, with respect to the evidence concerning Craft's criminal record and family problems, were preliminary in nature and were reserved for consideration during trial.

Before ruling on the motions, the trial court expressly stated:

> the Court is limiting its ruling solely on the grounds raised in the Motion in Limine. To the extent that the Court grants or denies a Motion in Limine[,] if there are further foundational requirements that need to be met, the proponents of the introduction of the evidence shall also meet these foundational requirements[,] so for example[,] if the Court is denying a motion in limine pertaining to the admission of certain evidence, the Court is only ruling on the issue raised in the motion.

The question thus narrows to when the "exception" proffered in *Lussier* applies. The ICA in *Lussier* cited *State v. Miller,* 229 N.W.2d 762 (Iowa 1975), for the proposition that, where the motion in limine amounted to an "unequivocal" holding, further objections are unnecessary. The Iowa Supreme Court in *Miller* held that

> the defendant's motion in limine achieved *more than simply apprising the judge of future rulings* he might be required to make during trial. The trial judge stated exactly what he planned to allow in the way of admission of testimony bearing on prior felony convictions. *It was certain the State would be permitted to introduce the fact that defendant was a convicted felon and the number of convictions.*

*Miller,* 229 N.W.2d at 767–68 (emphasis added). *Miller,* however, is distinguishable from the instant case. *Miller* was a criminal case where the court ruled, as a matter of law, that defendant's criminal records could be admitted. In the present case, the court did not rule with certainty that the evidence concerning Craft's criminal record and family problems would be allowed into evidence. Instead, it expressly reserved the right to rule on the subject evidence until the foundational grounds were satisfied during trial.

■ Moreover, even if the exception applied, the trial court did not err in admitting the evidence. Under *Kealoha,* evidentiary decisions requiring a "judgment call" are reviewed for an abuse of discretion. Under HRE 403, which is applicable here, the trial court determines whether the probative value of the relevant evidence is substantially outweighed by its prejudicial effect. At trial, Craft claimed that the "mental anguish" she had suffered as the result of her ruptured implants, during the relevant period from 1984 to 1991, caused her emotional damages. Dr. Peebles and McGhan responded that there were other events that may have led to Craft's "mental anguish" during this period—namely, the "mental anguish" from her arrests on May 3, 1988, and October 24, 1990, as well as the problems related to her allegedly abusive husband. Considering that the probative value of such relevant evidence was not substantially outweighed by its prejudicial effect, the court did not abuse its discretion in allowing the evidence.

## 2. Evidence of Craft's Alleged Substance Abuse

The trial court initially granted Craft's motion in limine to exclude evidence and testimony of her alleged substance abuse because "there [was] no evidence of the nexus of [the] alleged substance abuse to the physical complaints of the Plaintiff." However, during trial, the court allowed the defense to cross-examine Craft with respect to her alleged substance abuse over objection. Craft argues that the court erred by permitting the

cross-examination because it painted her as a "drug addict" and inflamed the jury.

With respect to the cross-examination of Craft, regarding her alleged substance abuse, Craft's counsel objected repeatedly:

[McGhan's Counsel]: You were complaining about at that time of insomnia and trouble coping; correct?

Craft: Mild coping, yes.

[McGhan's Counsel]: And that had to do with this fact that ... this elderly friend of yours had died; correct?

Craft: That's correct.

[McGhan's Counsel]: You were depressed and nervous; correct?

Craft: Yes.

[McGhan's Counsel]: And he [doctor] prescribed you Restoril [a pain-killer] again?

Craft: Yes.

[McGhan's Counsel]: And on the 20th, less than 20 days later, you called in for more Restoril; right?

Craft: Yes.

[Craft's Counsel]: Your Honor, I would object again to this line of questioning.

The Court: State your legal basis.

[Craft's Counsel]: Objection, irrelevant and prejudicial, your Honor. And if I can approach the bench[?]

BENCH CONFERENCE

[Craft's Counsel]: This whole line of questioning about drug use is completely irrelevant ... If [McGhan's Counsel] is trying to make some sort of issue that [Craft] is a drug addict or something, he's not doing it in the foundation. All it's doing is trying to inflame the jury to develop some sort of prejudice that she's a drug user or something[.]

[McGhan's Counsel]: It will become clear as we get more and more in this that there's times when she's going back and forth between two and three doctors getting prescriptions for these kinds of medications for things completely different from anything related to ... her breast condition.

Since she has said she had this constant pain ever since the procedure by Dr. Peebles which she attributes to the procedure and silicone implants, it certainly is proper for us to bring out that she was having pain and taking these pain medications from [sic] many other things ... other than those she's blaming my client for.

The Court: Counsel, I find it relevant.

[Craft's Counsel]: Your honor, this is ridiculous ... they have no medical testimony that any of the symptoms are caused by drug use ... it takes them no place except to prejudice.

■ As previously stated, a trial court's ruling on a motion in limine is not a final ruling on the admissibility of the evidence in question, but only preliminary in nature, and subject to reconsideration as the evidence in the trial is fully developed. *Lussier*, 4 Haw. App. at 393, 667 P.2d at 826. The record indicates that, irrespective of the trial court's in limine ruling, evidence admitted during the plaintiff's case in chief "opened the door" to the cross-examination regarding her alleged substance abuse.

Craft testified, on direct examination, that her ruptured implant was the cause of her headaches, joint pain, flu-like symptoms, stress, lethargy, fatigue, and other general malaise.[12] In support of her contentions, Craft's expert witness, Dr. Weiner, testified that Craft was suffering from "chronic silicone arthropathy," a term used for patients who had prolonged exposure to silicone gel implants and who developed muscle pain, joint pain, and/or nerve pain, or flu-like sensations for a year or longer. On cross-examination, however, Dr. Weiner testified, *without objection*, that the "pain-killers" used by Craft for conditions relating to a tooth abscess, bronchitis, sinusitis, and other ailments unrelated to silicone exposure, namely Valium and Vicodin, could produce side effects like lethargy and fatigue, which Craft had attributed mostly to silicone exposure.

Craft's expert witness, Dr. Arrington, also testified on cross-examination, *without objec-*

---

12. Craft testified that no physician could attribute the symptoms to anything other than silicone. She also testified that the headaches appeared only on the side of her head with the ruptured implant.

*tion,* that repeated administration of "a federally controlled narcotic substance" such as Anexsia (a "pain-killer"), which was prescribed to Craft during the period in question (1984–91) for conditions relating to her tooth abscess, bronchitis, sinusitis, and other ailments unrelated to the silicone exposure, can also produce side effects similar to "chronic silicone arthropathy" (*e.g.,* lethargy, drowsiness, flu-like symptoms, and general malaise). Dr. Arrington testified that, within a period of eighteen months (from December 1990 to June 1992), Craft was prescribed over 1500 Anexsia capsules. Additionally, Dr. Arrington opined that Craft may have developed a physical dependence on Anexsia, and that Anexsia may cause withdrawal symptoms such as joint pains, flu-like symptoms, and general malaise.

■ The testimony elicited from Drs. Arrington and Weiner was relevant to the defense's contention that Craft's alleged injuries were not the legal result of silicone exposure. Because a plaintiff in a medical malpractice case must prove that the negligence of the defendant physician was a legal cause of the plaintiff's injury, alternative causes of illness are legitimate subjects of inquiry. *See Devine v. Queen's Medical Center,* 59 Haw. 50, 574 P.2d 1352 (1978).

In light of all of the testimony concerning the alternative causes of Craft's symptoms that preceded Craft's cross-examination regarding her drug use, we hold that the trial court did not err under HRE 401 and 403 in admitting the subsequent evidence that indicated that Craft's symptoms may have been linked to her drug use and not solely to her exposure to silicone.

### 3. Nude Photographs

Craft introduced unclothed photos that depicted her breasts prior to breast augmentation in 1980, prior to removal of the implants in 1992, and after she had the implants removed.

Craft's motion in limine was granted to "limit the use and admission of photographs

of ... Craft[.]" Craft was primarily concerned with photos produced during discovery that depicted her unclothed body below the waist. Photos of her unclothed upper body apparently were not a concern at the time of the motion.

■ McGhan attempted to admit photographs depicting Craft's breasts during the time her implants were in place, both before and after the rupture. The "before-rupture" photographs allegedly showed the benefits received from its product,[13] and the "after-rupture" photographs ostensibly related to Craft's credibility and claims for damages. During trial, three photographs, marked as Defendant's exhibits M3B, M3X, and M3U, were admitted without objection by Craft. Craft, however, objected to two other photographs marked as Defendant's exhibits M3D and M3S.

McGhan offered exhibits M3D and M3S to show Craft's face allegedly expressing the satisfaction she had received from the breast implants. Craft objected, arguing that the jury might be prejudiced by her facial expressions when displaying her body. Craft requested that the head portion in exhibit M3S be cropped before introduction. The court admitted exhibit M3S without redaction, but ordered the redaction of Craft's head in exhibit M3D, over McGhan's objection.

■ Craft's contention on appeal, with respect to exhibit M3D, is moot because the photo was redacted to omit Craft's facial expression, the very basis for her objection. With respect to exhibit M3S, Craft's objection was without merit; exhibit M3S depicts Craft's lactating breasts, and Craft's facial expression is not discernible.

### B. *Dr. Peebles' Motion for Partial Summary Judgment.*

### 1. Standard of Review

It is well settled that

---

**13.** The benefits a person receives from a product is relevant in a strict products liability case to determine whether a product is defective in design by weighing the benefits of the design against the risk of danger inherent in the design. *Masaki v. General Motors Corp.,* 71 Haw. 1, 25, 780 P.2d 566, 579, *reconsideration denied,* 71 Haw. 664, 833 P.2d 899 (1989).

[o]n appeal, an award of summary judgment is reviewed under the same standard applied by the trial courts. Under Hawai'i Rules of Civil Procedure Rule 56(c), summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Dawes v. First Ins. Co. of Hawai'i, Ltd.,* 77 Hawai'i 117, 121, 883 P.2d 38, 42 (citations omitted), *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

### 2. Craft's Burden to Establish the Relevant Standard of Medical Care by Expert Medical Testimony, and the Effect of McGhan's "Package Insert"

The trial court granted Dr. Peebles' motion for partial summary judgment, thereby dismissing Craft's claim of negligence against Dr. Peebles on the specific ground that Craft failed to provide expert medical testimony regarding the standard of care. Craft argues that the court erred because a plaintiff need not provide such testimony when a physician performs treatment in violation of express warnings in a drug manufacturer's "package insert," which is a compilation of information concerning the medical product included by the manufacturer in the packaging of the product. The "insert" exception to the general requirement of expert medical testimony is one of first impression in this jurisdiction.

It is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony. *Nishi v. Hartwell,* 52 Haw. 188, 195, 473 P.2d 116, 121 (1970) (citations omitted). The standard of care to which a doctor has failed to adhere must be established by expert testimony because "a jury generally lacks the 'requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert.'" *Rosenberg v. Cahill,* 99 N.J. 318, 325, 492 A.2d 371, 374 (1985) (citations omitted). There are, however, exceptions to the rule.

The "common knowledge" exception, which is similar to the doctrine of *res ipsa loquitur,* provides that certain medical situations present routine or non-complex matters wherein a lay person is capable of supplanting the applicable standard of care from his or her "common knowledge" or ordinary experience. *See id.; see also Medina v. Figuered,* 3 Haw.App. 186, 188, 647 P.2d 292, 294 (1982).[14]

> There are "some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe or he suffers a serious burn from a hot water bottle, or when instruments are not sterilized, the thing speaks for itself without the aid of any expert's advice."

*Medina,* 3 Haw.App. at 188, 647 P.2d at 294 (quoting W.P. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts,* § 39 at 227–28 (4th ed. 1978) (footnotes omitted)). When the "common knowledge" exception is applied, the medical malpractice case transforms into an ordinary negligence case, thus obviating the necessity of expert testimony to establish the applicable standard of care. *Rosenberg,* 99 N.J. at 325, 492 A.2d at 374. This exception, however, is rare in application. *Id.*

In light of the information provided in McGhan's package insert, Craft asserts that the "common knowledge" exception applies, because the information contained in the package insert brings the standard of care regarding the performance of a closed capsulotomy within the realm of routine or non-complex matters in which a lay person is

---

14. Craft and Dr. Peebles cite a string of cases in support of this well-settled proposition. *See, e.g., Totten v. Adongay,* 175 W.Va. 634, 337 S.E.2d 2 (1985); *Collins v. Greenstein,* 61 Haw. 26, 595 P.2d 275 (1979); *Kendall v. State,* 692 P.2d 953 (Alaska 1984); *McWain v. Tucson General Hosp.,* 137 Ariz. 356, 670 P.2d 1180 (App.1983); *Reynolds v. Burt,* 359 So.2d 50 (Fla.App.1978).

capable of supplanting the applicable standard of care, thereby eliminating the need to present expert medical testimony regarding the standard of care.

Medical malpractice plaintiffs have traditionally been required to produce expert medical testimony to prove the applicable standard of medical care and the breach of that standard, and have often encountered practical problems in procuring such testimony, such as the reluctance of physicians to testify against their colleagues. As a result, the issue of whether a drug manufacturer's recommendations concerning the use of its drug in the package insert and the parallel entry in the Physician's Desk Reference[15] may be used as an *alternative or a supplement to expert medical testimony* in proving the standard of care in connection with a physician's prescription and administration of a drug can be crucial.

Annotation, *Medical Malpractice: Drug Manufacturer's Package Insert Recommendations as Evidence of Standard of Care,* 82 A.L.R.4th 166, 172–73 (1990) (emphasis added).

McGhan's package insert contained, *inter alia,* the following:

The surgeon should be aware that the *treatment of capsular contracture by manual compression of the breast* may cause the saline and/or gel envelopes to rupture with attendant extravasation being probable. McGhan cannot guarantee the integrity of the implant in that situation and *does not recommend this procedure.*

(Emphasis added.) Dr. Peebles does not dispute that he had inserted McGhan's breast implants in other patients prior to October 9, 1984, and was actually or constructively aware of the above warning.

Although many jurisdictions now recognize the "insert" exception, there is a division of authority on whether a drug manufacturer's package insert merely constitutes evidence to be considered along with the expert's testimony, or whether it supplants expert testimony and may, by itself, establish the standard of care.

Craft argues that where an "insert" provides proper instructions, it constitutes prima facie evidence of the standard of care which renders expert testimony unnecessary, as noted by *Mulder v. Parke Davis,* 288 Minn. 332, 181 N.W.2d 882 (1970):

Where a drug manufacturer recommends to the medical profession (1) the conditions under which its drug should be prescribed; (2) the disorders it is designed to relieve; (3) the precautionary measures which should be observed; and (4) warns of the dangers which are inherent in its use, a doctor's deviation from such recommendations is prima facie evidence of negligence if there is competent medical testimony that his patient's injury or death resulted from the doctor's failure to adhere to the recommendations.

*Id.* at 339–40, 181 N.W.2d at 887.[16]

*Ohligschlager v. Proctor Community Hosp.,* 55 Ill.2d 411, 303 N.E.2d 392 (1973), adopted *Mulder,* and held that the explicit instructions provided by the manufacturer

---

**15.** [Because] physicians usually do not see these drug package inserts, a compilation of the inserts, referred to as the Physician's Desk Reference (PDR), which is published annually and supplemented quarterly, is distributed to the medical profession free of charge, at the expense of the drug manufacturers. A typical PDR entry includes ... a description of the drug, indications and contraindications for its use, warnings, adverse reactions, [and] administrations and dosage[.]
Annotation, *Medical Malpractice: Drug Manufacturer's Package Insert Recommendations as Evidence of Standard of Care,* 82 A.L.R. 4th 166, 173 (1990) (footnote omitted).

**16.** Craft cites several cases which follow the "*Mulder*" rule. *See, e.g., Paul v. Boschenstein,*

105 App.Div.2d 248, 482 N.Y.S.2d 870 (1984) (package insert evidence is sufficient to show a deviation from the standard of care); *Kollmorgen v. Medical Examiners,* 416 N.W.2d 485 (Minn. 1987) (a deviation from a drug manufacturer's recommendation is considered prima facie evidence of negligence if injury is proven); *Thompson v. Carter,* 518 So.2d 609 (Miss.1987) (a package insert for a drug, although not conclusive, contains prima facie proof of the proper method of use); *Mozer v. Kerth,* 224 Ill.App.3d 525, 166 Ill.Dec. 801, 586 N.E.2d 759 (1992) (although package insert establishes standard of care, plaintiff must still show by expert testimony that physician failed to follow explicit instructions of the manufacturer).

warning of the hazards accompanying improper administration of the drug provided prima facie proof of the professional standard for the drug's use, which would ordinarily have to be shown by expert medical testimony. *Ohligschlager*, 55 Ill.2d at 418, 303 N.E.2d at 396.

The contrary view provides that a manufacturer's package insert does not conclusively represent the standard of care. Rather, the insert constitutes evidence which the trier of fact may consider along with expert testimony. In *Salgo v. Leland Stanford Jr. Univ. Board of Trustees*, 154 Cal.App.2d 560, 317 P.2d 170 (1957), the court held that while a manufacturer's insert was admissible, it could not establish the standard of medical care as a matter of law. The insert may be considered along with "the other evidence in the case to determine whether the particular physician met the standard of care required of him [or her]." *Id.* at 577, 317 P.2d at 180. The court reasoned that drug manufacturer's recommendations are always conservative and are quickly outdated, and after a drug has been available for a period of time, physicians rely on their own experience concerning its use in actual practice, because manufacturers do not use the drug, but only prepare it. *Id.* at 576, 317 P.2d at 180.

Similarly, in *Ramon v. Farr*, 770 P.2d 131 (Utah 1989), plaintiffs brought a medical malpractice action based on defendant's injecting a mother's cervical region with the anesthetic Marcaine before the birth of her child, who later developed permanent physical and mental defects. The Marcaine package insert stated that such a procedure was not recommended because fetal bradycardia (slowness of the heartbeat) frequently followed. The court held:

> [W]e think the better rule is that manufacturers' inserts and parallel P.D.R. [Physician's Desk Reference] entries *do not by themselves set the standard of care, even as a prima facie matter*. A manufacturer's recommendations are, however, some evidence that the finder of fact may consider along with expert testimony on the standard of care.

. . . .

Although package inserts may provide useful information, they are not designed to establish a standard of medical practice, and their conflicting purposes make it extremely unlikely that they could be so designed.

. . . .

The American Medical Association, while recognizing inserts as one useful source of information, has repeatedly alleged that inserts are an inadequate standard for medical practice, pointing to the inconsistent purposes served by the document[s]—advertising for the manufacturer, regulation by the government, and information for the doctor—and to the poor quality of past inserts.

. . . .

> "[D]ifferences between the package insert and accepted medical practice represent the difference between the rigorous proof a regulatory agency must demand and the clinical judgment of a physician based on his [or her] training, experience, and skill as related to the needs of his [or her] individual patient. One cannot be taken as a standard for the other."

*Id.* at 135–36 (emphasis added) (internal citations omitted); *see also Grayson v. State*, 838 P.2d 546, 549 (Okla.1992) ("We adopt the rule from *Ramon* and *Salgo*, i.e., that the manufacturer's recommendation may be considered along with all other evidence."); *Hamilton v. Hardy*, 37 Colo.App. 375, 549 P.2d 1099 (1976) (standard of medical care set by the objective standard of the community, which a manufacturer's warning may or may not satisfy).

▮ We are persuaded by the reasoning in the line of authority as represented by *Salgo* and *Ramon*, and hold that a manufacturer's package insert, in and of itself, may not establish the relevant standard of care in a medical negligence action. The inserts may be considered by the fact finder along with expert testimony, but may not alone define the standard of care.[17]

17. When the inserts, which were designed to guide doctors, are presented as evidence to lay-

persons on a jury, the question whether jurors are able to formulate the proper standard of care

In the instant case, Craft did not present expert medical testimony in conjunction with McGhan's package inserts at summary judgment. Although Dr. Schultz later testified at trial that he would not have performed a closed capsulotomy on a lactating woman,[18] such testimony was not provided at the summary judgment hearing and therefore will not be considered on appeal. *See Feliciano v. Waikiki Deep Water, Inc.,* 69 Haw. 605, 607, 752 P.2d 1076, 1078 (1988); *see also Mozer,* 166 Ill.Dec. at 804–05, 586 N.E.2d at 762–63. Moreover, Dr. Schultz's deposition testimony taken on October 24, 1988, which was submitted for the trial court's consideration on Dr. Peebles motion for summary judgment, provides that Dr. Schultz had performed closed capsulotomies in the past, and as of the time of the deposition, was still performing them. Dr. Leabert Fernandez, Dr. Peebles' independent expert plastic surgeon, also testified at his deposition taken on February 20, 1992, that he had performed many closed capsulotomies, and had performed them through at least 1986. The fact that physicians, including Craft's expert, performed closed capsulotomies, despite the language provided in the insert, clearly explains why the insert alone should not be viewed as establishing the standard of care.

Because we hold that package inserts alone, without supporting expert testimony, are insufficient to establish a standard of care, we affirm the trial court's order granting partial summary judgment in favor of Peebles on the negligence issue.

### C. *Craft's Expert Witness Testimony*

Craft next argues that the trial court improperly curtailed the opinions of her expert witnesses, Talcott and Dr. Arrington, on the causation of her bodily injuries by "silicone disease." The admission of opinion testimony by an expert is authorized pursuant to HRE Rule 702, which provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

*Id.* On appeal, the admissibility of expert testimony is reviewed for abuse of discretion. *Yap v. Controlled Parasailing of Honolulu, Inc.,* 76 Hawai'i 248, 254, 873 P.2d 1321, 1327 (1994). *See also State v. Matias,* 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) ("The general rule is that admissibility of expert testimony is a matter within the broad discretion of the trial judge, and his [or her] decision will not be overturned ... unless manifestly erroneous or clearly an abuse of discretion." (Citation omitted.)). " 'A trial court abuses its discretion when it clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Yap,* 76 Hawai'i at 254, 873 P.2d at 1327 (quoting *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 258, 861 P.2d 1, 6 (1993)).

### 1. Thomas Talcott, Chemical Engineer

The trial court refused to permit Craft's expert, Talcott, to testify about the effects of silicone on the human body with regard to migration. Talcott was, however, allowed to testify at length about the "defectiveness" of McGhan's implant, based upon his background, experience, and the thousands of PFRs that he reviewed for the case.

---

is a serious concern. *See* Comment, *Package Inserts for Prescription Drugs as Evidence in Medical Malpractice Suits,* 44 U.Chi.L.Rev. 398, 425 (1977). "Critics of inserts as evidence claim that a medical background is necessary to comprehend insert terminology and to recognize the limitations of the information presented." *Id.* "Unlike experts on the stand, inserts cannot aid the jury by answering hypothetical questions concerning their application to a particular case." *Id.* Additionally, the drug company supplying the inserts has conflicting motives: to sell the drug, to avoid tort liability for failure to warn, and to give basic information to physicians. *Id.* at 424.

18. Dr. Schultz testified at trial that because a "reasonable chance" exists that the hardness that accompanies capsular contracture in a lactating woman's breasts would dissipate once the woman stops lactating, he would recommend that the woman wait until she had stopped breast feeding and her breast had decreased in volume before undergoing a closed capsulotomy procedure.

■ During Talcott's voir dire examination, the court determined that he did not have any education, training, or experience regarding the interaction of silicone gel with the human body. Talcott is a chemical engineer; he had no formal study or training in physiology, biophysics, biomedical engineering, cytology, biology, or microbiology. Nor did he have formal training in medicine or any medical related subject. Experiments that Talcott performed during his employment with several different silicone implant manufacturers were limited to chemical and materials engineering. Talcott's work experience familiarized him with the properties of silicone implants, but not with the medical effects of silicone interactions with the human body.

Based on Talcott's qualifications, or lack thereof, the court did not abuse its discretion by limiting Talcott's testimony to his field of expertise, namely, chemical and materials engineering. Therefore, under HRE 702, the court properly limited Talcott's testimony to matters within Talcott's background, experience, and training, that is, within the field of chemical engineering.

## 2. Dr. Clifton Arrington, General Practitioner

The trial court refused to allow Dr. Arrington, one of Craft's treating physicians, to testify as to the cause of Craft's symptoms. The trial court found that Dr. Arrington was not qualified to testify that silicone was persistently causing Craft's right breast and shoulder pain due to an inflammation reaction to the silicone. The trial court ruled that Dr. Arrington could testify as to his observations, but could not give his opinion as to causation.

■ The record reflects that Dr. Arrington does not possess any education, training, or experience with silicone. He is a general practitioner with an orientation toward holistic medicine and alternative therapies, such as nutritional, vitamin, and herbal remedies. He is not a pathologist, general surgeon, plastic surgeon, or an immunologist. Prior to moving to Hawai'i, Dr. Arrington practiced with chiropractic, naturopathic, and holistic medicine specialists.

Nothing in Dr. Arrington's background or experience suggested that he would be competent to testify regarding the effects of silicone on the human body. Therefore, we hold that the court did not abuse its discretion in limiting Dr. Arrington's testimony.

### D. Jury Instructions

#### 1. Standard of Review

When jury instructions, or the omission thereof, are at issue on appeal, "the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *Myers v. South Seas Corp.*, 76 Hawai'i 161, 164, 871 P.2d 1231, 1234, *reconsideration granted in part, denied in part*, 76 Hawai'i 353, 877 P.2d 890 (1994) (quoting *State v. Kelekolio*, 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993). *See also Montalvo v. Lapez*, 77 Hawai'i 282, 286, 884 P.2d 345, 349, ("Jury instructions . . . must be considered as a whole. Moreover, a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given.") (quoting *State v. Pioneer Mill Co., Ltd.*, 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981)), *reconsideration denied*, 77 Hawai'i 489, 889 P.2d 66 (1994).

#### 2. Contributory Negligence

Relying on *Keomaka v. Zakaib*, 8 Haw. App. 518, 811 P.2d 478, *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1991), Craft argues that the trial court's jury instruction on contributory negligence was reversible error. Craft maintains that: (1) contributory negligence is inapplicable in an action for failure to obtain informed consent; (2) there was no basis for contributory negligence on the part of Craft; and (3) the jury was prejudiced by McGhan's reference to "assumption of risk" in its closing argument.

In *Keomaka*, the ICA held that, in an action for failure to obtain informed consent, instructing the jury on contributory negligence was misplaced and constituted reversible error, even though the jury never reached the question on the special verdict form. *Keomaka*, 8 Haw.App. at 533–34, 811

P.2d at 487. The court reasoned that, in addition to the improper instructions, the jury was further prejudiced by defendant's closing argument, which paraphrased the inaccurate instructions on contributory negligence. *Id.* *Keomaka*, however, is distinguishable.

In *Keomaka*, the doctor was the sole defendant whereas, in the present case, Dr. Peebles had a co-defendant, McGhan, who as discussed below, was entitled to a contributory negligence instruction. Additionally, in *Keomaka*, the ICA found the combination of the contributory negligence instruction and the closing argument prejudicial. In the present case, Dr. Peebles' counsel did not address contributory negligence in his closing argument.

■ As noted above, Craft's negligence claim against Dr. Peebles was dismissed at summary judgment. The trial court's instructions on contributory negligence were therefore inappropriate with respect to Dr. Peebles. Thus, pursuant to *Keomaka*, Craft was entitled to a limiting instruction explaining that the contributory negligence or assumption of risk defense did not apply to the "failure to obtain informed consent" claim. However, Craft did not seek such an instruction. Moreover, the trial court's reading of the instruction was rendered harmless because the jury never reached the question on contributory negligence. *See State v. Pinero*, 75 Haw. 282, 292, 859 P.2d 1369, 1374 (1993) ("Both in civil and in criminal cases the instructions of the court must be read together as one connected whole, to ascertain whether they correctly declare the law.").

■ However, the contributory negligence instruction was appropriate with respect to McGhan because the evidence presented at trial raised a bona fide issue with respect to Craft's alleged contributory negligence. The record indicates that Craft testified she smoked a pack of cigarettes a day

and that she had been smoking for seventeen years. Craft's expert, Dr. Weiner, testified that Craft's bronchitis and the incidental malaise she experienced could have resulted from the cigarettes. Based on the evidence, the jury could have found, although they never reached the issue, that Craft negligently contributed to her chronic cough and bronchitis, which Craft imputed solely to McGhan's defective implants.

Craft responds that, in *Armstrong v. Cione*, 69 Haw. 176, 738 P.2d 79 (1987), this court barred the use of contributory negligence in strict products liability actions. Craft's claims against McGhan, however, were based upon both strict products liability and negligence. As to the issue of negligence, the instruction on contributory negligence was properly given. *See id.* at 180–83, 738 P.2d at 82–83. Moreover, Craft did not request a limiting instruction that contributory negligence did not apply to the claim of strict products liability.

■ Lastly, Craft erroneously argues that McGhan's reference to "assumption of risk" in its closing argument was unfounded in the law. This court has expressly held that the theory of "assumption of risk" is applicable in negligence actions. *See Kaneko v. Hilo Coast Processing*, 65 Haw. 447, 464, 654 P.2d 343, 354 (1982) ("By holding that the concepts [of strict products liability and comparative negligence] are merged, we eliminate the harshness of the 'all or nothing' bar to recovery that results if plaintiff is found to have misused the product or assumed the risk of using the product.").[19]

### 3. "Learned Intermediary" Rule

Craft next asserts that the trial court improperly instructed the jury regarding the "learned intermediary" rule. The trial court's instruction provided that, "[a] medical device manufacturer's duty to warn of risk

---

19. *See also Larsen v. Pacesetter Sys.*, 74 Haw. 1, 33–34, 837 P.2d 1273, 1290 (1992) ("Where comparative negligence principles apply, assumption of risk that is a form of contributory negligence serves to reduce, rather than bar, plaintiff's recoveries."). Although cited by Craft in support of her arguments regarding the trial court's contributory negligence instruction, we note that *Larsen* was decided on September 30, 1992, over a month after McGhan's counsel delivered his closing argument in the present case on August 15, 1992. Notwithstanding its inapplicability to the present case, *Larsen* is the definitive statement regarding the principles of assumption of risk and comparative negligence in the products liability context.

extends only to the physician, not the patient."

"[T]he learned intermediary rule ... assumes that it is reasonable for a manufacturer to rely on the prescribing physician to forward to the patient, who is the ultimate user of the drug products, any warnings regarding their possible side effects." *Hill v. Searle Laboratories*, 884 F.2d 1064, 1070 (8th Cir.1989). The rule "does not alter the duty of a manufacturer to provide adequate warnings ... rather, the doctrine simply substitutes the physician for the consumer as the person to receive those warnings." *Desmarais v. Dow Corning Corp.*, 712 F.Supp. 13, 18 (D.Conn.1989). Because the manufacturer has little or no contact with the ultimate consumer and the treating physician makes the purchasing decisions and judgments concerning medical products, the warnings are better conveyed to the physician "user." *Hill*, 884 F.2d at 1070–71.

Craft argues that the learned intermediary rule does not apply to breast implants, in general, nor to the facts of this case, in particular. Additionally, Craft maintains that the learned intermediary theory does not apply in the instant case because choosing a type of breast implant is analogous to choosing a type of contraceptive—both require a conscientious choice on the part of the woman. In other words, "[w]hile a physician may recommend one method over another, the final choice remains that of the woman." *Hill*, 884 F.2d at 1071. Craft notes that prior to her breast augmentation, she consulted several doctors on the types of insertion they used. Craft cites *Hill* for the proposition that breast implants, much like contraceptives, are atypical from most prescription drug products, and usually the patient makes an independent decision as to the selection of one implant over another. *Hill*, however, is distinguishable from the instant case.

In *Hill*, the court refused to apply the learned intermediary rule to prescription contraceptive Intra–Uterine Devices (IUDs) for three reasons: (1) birth control is "a private and personal matter involving a decision that is often dependent on factors to which the physician is not privy," *id.* at 1071;

(2) the manufacturer marketed the product with the idea of convincing women to choose its style or type of IUD over others; and (3) IUDs are given more often than not under clinic-type conditions where physician-patient contact is limited. *Id.* at 1071. The *Hill* court noted:

> Recognizing that these factors limit the role that a physician plays in determining the necessity and desirability of birth control, and the fact that physicians are inundated with information about various prescription drug products, [the court held] that in the case of IUDs, prescribing physicians do not make an individualized medical judgment.

*Id.* (footnote omitted).

In contrast, Craft's choice of implants in the present case employed a different selection process from the plaintiff's choice of a type of IUD in *Hill*. Although Craft consulted several doctors with regard to the best method of insertion, unlike the woman who discriminately shopped for different *manufacturers'* brands of IUDs in *Hill*, Craft chose the maker of the implants indiscriminately. In fact, Craft was not given a choice of manufacturers nor was the manufacturer of the implant a concern to her. Craft's sole concern was with selecting the type of insertion method that would produce the least visible scarring. Moreover, in the present case, Craft had extensive contact with her physician both prior and subsequent to the insertion of the implants.

Other cases that deal with breast implants provide assistance to our analysis. For example, in *Lee v. Baxter Healthcare Corp.*, 721 F.Supp. 89 (D.Md.1989), *aff'd*, 898 F.2d 146 (4th Cir.1990), the court noted that the "learned intermediary" rule had its genesis in the prescription drug arena, but its application had been expanded to medical devices by analogy. *Id.* at 95. Noting that "physicians are in a better position to assess risks and determine when a particular patient reasonably should be informed about a risk," *id.* (quoting *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1232 (4th Cir.1984)), the *Lee* court applied the "learned intermediary" rule to warnings regarding breast implants and held that, "[i]f the prescribing physician has re-

ceived adequate notice of possible complications, the manufacturer has no duty to warn the consumer." *Lee,* 721 F.Supp. at 95.

Similarly, in *Toole,* 999 F.2d 1430, *reh'g denied,* 11 F.3d 169 (11th Cir.1993), plaintiff Brenda Toole experienced capsular contracture in 1987, after breast augmentation surgery with silicone gel-filled implants in 1981. Toole returned to her physician, Dr. McClintock, who performed a closed capsulotomy. Toole alleged that McClintock's performance of the closed capsulotomy procedure ruptured the implant, allowing silicone gel to escape into the surrounding tissue. Toole underwent several operations to replace her implants and to remove granulomas. She brought suit against McClintock and Baxter Healthcare Corporation (Baxter), the manufacturer of the implants, and others, alleging, *inter alia,* failure to warn. At trial, Toole obtained a jury verdict in her favor against Baxter, and Baxter appealed. Holding that the "learned intermediary" rule applied, the Eleventh Circuit Court of Appeals stated that "the adequacy of [a breast implant manufacturer's] warning is measured by the effect on the *physician,* ... to whom it owed a duty to warn, and not by its effects on [the patient]," *id.* at 1433, and vacated the award.

We agree with the reasoning in *Lee* and *Toole,* and accordingly hold that the trial court properly instructed the jury on the "learned intermediary" theory.

### 4. Medical Probability

Craft next contends that the trial court improperly instructed the jury with respect to medical probability. The jury was instructed that

[t]he opinion of a doctor as to the condition of the patient may be based entirely upon objective symptoms revealed through observation, examination, tests or treatment or *the opinion may be based entirely on subjective symptoms revealed only through statements made by the patient* [.]

(Emphasis added.) The jury was then instructed to "disregard any medical opinion [it] may have heard pertaining to subjective symptoms of a plaintiff that was not based upon reasonable medical probabilities." Craft argues that these instructions, in effect, ordered the jury to disregard Craft's description of her injuries. We disagree.

The above-quoted instruction merely advised the jury that any medical opinion "not based upon reasonable medical probabilities" should be disregarded. It does not instruct the jury to disregard any statements made by Craft in describing her subjective symptoms to her physicians. To the contrary, the instruction provides that the medical opinion may be based entirely on Craft's description of her injuries. That opinion, however, must be based on reasonable medical probability. *See McBride v. United States,* 462 F.2d 72, 75 (9th Cir.1972) (In a medical malpractice action, a plaintiff must show with reasonable medical probability a causal nexus between the physician's treatment or lack thereof and the plaintiff's injury.); *Duff v. Yelin,* 721 S.W.2d 365 (Tex.App. 1986) (The opinion testimony of a medical expert providing the causal nexus must be grounded upon reasonable medical probability as opposed to a mere possibility because possibilities are endless in the field of medicine.).

As McGhan correctly notes, the instruction was important and appropriate because the medical testimony introduced by Craft's experts regarding Craft's subjective symptoms included new theories of medical causation, which might not, in the jurors' eyes, rise to the requisite degree of certainty to establish a medical probability. For instance, based on the record, the jury could have concluded that certain hypotheses testified to by Drs. Kossovsky and Weiner were not sufficiently tested to establish Craft's damages to a reasonable medical probability.[20]

---

**20.** For example, Dr. Kossovsky hypothesized that silicone gel from breast implants may affect the immune system. Dr. Kossovsky had performed a study in which guinea pigs showed an immune system reaction when exposed to silicone gel combined with a certain protein and a certain oil used to heighten immunologic reaction. Dr.

Kossovsky also acknowledged, however, that other physicians' studies have found that laboratory rats are not sensitized as a result of exposure to pure silicone. Dr. Kossovsky also acknowledged that, although he has been able to locate symptoms indicative of systemic immune problems in other patients, his review of Craft's medical rec-

## 5. Informed Consent

▮ Finally, Craft argues that the trial court improperly instructed the jury that a plaintiff who brings "an action based on informed consent must establish the applicable standard of care through expert medical testimony [and] [m]anufacturer's package inserts do not, by themselves, set the standard of care which is applicable to a physician on the issue of informed consent[.]" Craft's argument here is essentially identical to those asserted in conjunction with Dr. Peebles' motion for partial summary judgment on the standard of care issue. As noted above, the trial court was correct in holding that manufacturer's package inserts alone are insufficient to establish the relevant standard of medical care. We hold that the instruction as to informed consent was a correct statement of the law.

### E. McGhan's PFRs on the Ruptured Implants

McGhan filed a motion in limine to preclude the wholesale admission of 3,700 PFRs obtained from McGhan during pre-trial discovery by Craft. Craft also filed a motion in limine in support of the admission of all 3,700 PFRs.

The trial court ruled that: (1) the PFRs were reasonably relied upon by engineer Talcott in forming his opinions, and therefore, he could be questioned about them; (2) Talcott could mention that he saw "thousands" of PFRs; and (3) the actual documents, however, would not be admitted, except on cross-examination:

> The Court: [T]he Court reviewed the [PFRs] in this case which [were] provided by the Plaintiff's Counsel. Plaintiff's Counsel has represented to the Court, and I don't see any dispute that these were provided to Plaintiff's Counsel pursuant to a discovery request by the Defendant McGhan[;] the Court further finds that the [PFRs] relied on by Mr. Talcott in forming his opinions, forms part of his basis of the opinions, which this Court finds can be reasonably relied upon by experts in the witness' field[.]

> [McGhan's Counsel]: Your honor ... the witness has no way of knowing that the documents he reviewed ... were kept in any manner in the same order or form. And therefore, he would have no basis to know what the practices were at McGhan with respect to how these documents were used at McGhan.

> The Court: [T]he Court will not allow except on cross examination, the admission of documents. So the hearing which was conducted[,] was basically to satisfy the Court whether or not pursuant to Rule 703 and 705 that the [PFRs] are those that an expert in Mr. Talcott's field can reasonably rely upon. And certainly Mr. [ (referring to McGhan's counsel) ], the inquiry that you raised goes to cross examination as to the credibility of his opinions.

> [McGhan's Counsel]: Your Honor, and also unless we go into cross examination, he shouldn't mention any numbers.

> The Court: I will allow that he mention[,] as you said[,] thousands of [PFRs], but no specific numbers.

The court further ruled that the 3,700 PFRs: (1) lacked authentication; (2) lacked foundation as to the substantial similarity between the incidents reported in the PFRs and the issues raised at trial; and (3) constituted hearsay without any exception being otherwise established for its admissibility.

Craft argues that based on HRE 703 (expert opinion documentation), 803 (exception

---

ords produced no symptoms indicative of systemic immune system problems.

As previously noted, Dr. Weiner also hypothesized that patients with implants may also suffer from a condition he termed "chronic silicone arthropathy," where the patient may exhibit flu-like symptoms not attributable to other medical problems. Dr. Weiner testified that, based on his one examination of Craft, he believed Craft was suffering from chronic silicone arthropathy, in that Craft was suffering from recurrent flu-like symptoms that could not otherwise be explained. On cross-examination, Dr. Weiner also acknowledged, however, that research to establish the scientific link between silicone and rheumatological disorders was still in the very early stages, and that further large scale epidemological studies were needed. Dr. Weiner also acknowledged that symptoms such as fatigue and malaise may be attributable to the side effects of narcotics such as valium.

to hearsay), and 901–902 (authentication), the trial court erred in denying the admission of all 3,700 PFRs. McGhan responds that the court's rulings were proper and were not an abuse of discretion. McGhan further replies that, even if the rulings were an abuse of discretion, the jury found in favor of Craft on the only issues to which the PFRs could speak, that is, negligence and product defect. Therefore, McGhan submits that Craft was not prejudiced and the issue is moot. We agree.

Craft offered the PFRs to show that: (1) McGhan was on notice of the defective or dangerous condition of its breast implants; and (2) the implants were defective in design. In light of the fact that the jury found McGhan's implants "defective or negligently manufactured," which was the evidentiary purpose of the PFRs, Craft was not prejudiced by their exclusion. Craft counters that the issue is not moot because "McGhan was charged with negligence under alternative theories of proof, only one of which involved ineffective warnings." Craft's complaint alleged theories of inadequate warnings and negligent design, manufacturing, or assembly. Because all of these theories go to the issues of negligence or defect, which the jury found in favor of Craft, the issue is moot.

## F. *Special Verdict*

As previously noted, the jury found, by special verdict, that McGhan's implants were "defective or negligently manufactured," but were not "a legal cause of injury to Plaintiff Teena Craft." Craft thereafter moved for a JNOV, which the court denied.

On appeal, Craft argues that the jury's verdict was irreconcilably inconsistent and unsupported by substantial evidence, and therefore the trial court erred by denying her motion for a JNOV. Craft argues that "there was no evidence at all opposed on the issue of causation," and, although defendants disputed the degree of Craft's injuries, they did not dispute that "she was injured at all."

"A conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcil-

ably inconsistent." *Myers*, 76 Hawai'i at 163, 871 P.2d at 1233 (citing *Kalilikane v. McCravey*, 69 Haw. 145, 152, 737 P.2d 862, 867 (1987)). However, the verdict will not be disturbed if the answers can be reconciled under any theory. *Myers v. South Seas Corp.*, 10 Haw.App. 331, 346, 871 P.2d 1235, 1243 (1992) (*quoting Hauenstein v. Loctite Corp.*; 347 N.W.2d 272 (Minn.1984)), *aff'd*, 76 Hawai'i 161, 871 P.2d 1231 (1994).

In the present case, the record indicates alternative causes to Craft's claimed injuries. For instance, although the jury found that McGhan's breast implant was "defective or negligently manufactured," it could have determined that the legal cause of Craft's injuries was the closed capsulotomy performed by Dr. Peebles. The trial evidence indicated that breast implants, regardless of the manufacturer, had the potential to rupture when firm pressure was applied. The evidence also showed that McGhan had expressly warned against utilizing the closed capsulotomy procedure. It is well settled that negligence and causation are independent legal requirements, and that a finding of negligence does not automatically imply causation. *See Hauenstein*, 347 N.W.2d at 276.

Craft further argues that the jury could not have found the implants "defective," without also finding that "the [implant's] design was a legal cause of the injuries." Craft maintains that, by finding the implants "defective" but not a legal cause of the injury, the verdict was irreconcilably inconsistent. *See Kalilikane*, 69 Haw. at 152, 737 P.2d at 866. We disagree.

The jury was instructed that a product contains a "dangerous defect" if the design was defective under one of three tests, designated A, B, and C. Under Test B, "the product is defective in design if plaintiff proves that the product's design was a *legal cause* of the injuries and defendants failed to prove that the benefits of the design outweigh[ed] the risk of danger inherent in the design." (Emphasis added.) Indeed, if the jury found that the implant was defective under Test B, legal cause is a *sine qua non*, and the verdict would be irreconcilable. The infirmity in Craft's argument is that the jury

was provided with two other tests, A and C, that they could have utilized, neither of which required a finding of legal cause. Test A provided that "the product is defective in design if plaintiff establishes that it failed to perform as safely as an ordinary user of the product would expect when used in an intended or reasonably foreseeable manner, including reasonably foreseeable misuses." Test C provided that

the product is defective in design even if faultlessly made if the use of the product in a manner that is intended or reasonably foreseeable, including reasonably foreseeable misuses, involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer fails to give adequate warnings of the potential risk or side effects which are known or which should have been known.

Finally, Craft argues, without any supporting legal authority, that, because the plaintiff in *Toole* was awarded a $6,000,000 verdict in a similar breast implant case, the jury's verdict in the instant case was irreconcilable. Craft's argument is without merit. Even if some legal proposition in *Toole* applied here, the Eleventh Circuit Court of Appeals vacated the plaintiff's judgment in *Toole* and remanded the case for a new trial. *See Toole*, 999 F.2d 1430 (11th Cir.1993), *reh'g denied*, 11 F.3d 169 (1993).

### III.   CONCLUSION

Based on the foregoing discussion, we affirm on all issues raised.