903 P.2d 676

**Noah Phillip BERNARD, III, Plaintiff–Appellee/Cross–Appellant,**

v.

**John K. CHAR, D.D.S., Defendant–Appellant/Cross–Appellee,**

and

**John Does 1–10, Defendants.**

**No. 15634.**

Intermediate Court of Appeals of Hawai'i.

May 19, 1995.

Certiorari Granted May 30, 1995.

372

Peter C.-P. Char (Anne S. Kwiatkowski with him on the briefs; Char Hamilton Campbell & Thom, of counsel), Honolulu, for defendant-appellant/cross-appellee.

William L. Goo (Roy Y. Yempuku, Gordon I. Ito with him on the brief; Yempuku & Goo, of counsel), Honolulu, for plaintiff-appellee/cross-appellant.

Before BURNS, C.J., WATANABE, J., and AIONA, Circuit Judge, in place of ACOBA, J., disqualified.

WATANABE, Judge.

In this dental malpractice case arising out of a tooth extraction surgery, Defendant–Appellant John K. Char, D.D.S. (Dr. Char) appeals from: (1) the June 26, 1991 Judgment in favor of Plaintiff–Appellee Noah Phillip Bernard, III (Plaintiff) and against Dr. Char; (2) the September 17, 1991 order granting Dr. Char's Motion for Remittitur, or in the Alternative, Motion for a New Trial; (3) the September 20, 1991 amended order granting Dr. Char's Motion for Remittitur, or in the Alternative, Motion for a New Trial;

and (4) the February 25, 1992 Amended Judgment in favor of Plaintiff and against Dr. Char. According to Dr. Char, two reversible errors were committed by the trial court.

First, Dr. Char contends that the court improperly denied his motion for a directed verdict as to Count II of the Complaint (Breach of Informed Consent), since Plaintiff never established a prima facie negligence claim based on informed consent. In this regard, Dr. Char points out that: (1) because Plaintiff failed to adduce expert testimony as to the existence and extent of a dentist's duty to inform a patient of the risks of a tooth extraction surgery, duty was never proved; and (2) because Plaintiff failed to testify that he would not have undergone the tooth extraction surgery if he had been advised of the risks, causation was never established.

Additionally, Dr. Char argues that the trial court erroneously denied his motion for a new trial because the court's failure to grant a directed verdict as to Count II improperly sent the issue of informed consent to the jury, resulting in an excessive damages award.

We conclude that Plaintiff did establish a prima facie case of negligence based on lack of informed consent. Therefore, the trial court properly denied Dr. Char's motions for directed verdict and for a new trial. We accordingly affirm the judgments and orders from which this appeal was taken.

## I. BACKGROUND

On Saturday, January 10, 1987, Plaintiff went to Dr. Char's office, complaining of an excruciating toothache on the upper left side of his mouth which was causing him to experience an earache, pain in his right sinus area, chronic frontal headaches, an inability to sleep, and extreme anxiety. Plaintiff was Dr. Char's last patient for the day.

Dr. Char examined Plaintiff's teeth and took an x-ray of Plaintiff's left upper molar and wisdom teeth. The x-ray revealed that Plaintiff's tooth number 15 (tooth 15), or the second molar on the upper left side of his mouth, was extensively decayed on the distal (back part) of the tooth. Dr. Char observed

that Plaintiff's adjoining wisdom tooth (tooth 16) was unusually small and crooked, the gum area surrounding tooth 15 was red and inflamed, and Plaintiff's teeth were heavily coated with dental plaque and calculus. Dr. Char also noticed that the bone in which teeth 15 and 16 rested seemed to be thin, and it occurred to him that tooth 15 might be ankylosed, or fused, to the jawbone.

There was considerable disagreement at trial as to what transpired immediately after Dr. Char's examination of Plaintiff.

Dr. Char testified that he recommended to Plaintiff that a root canal procedure[1] be performed in order to save the decayed tooth. He also explained the risks and benefits of such a procedure. When Plaintiff stated that he could not afford to undergo a root canal procedure, Dr. Char discussed the alternative of tooth extraction, again explaining the risks and benefits of the procedure. Dr. Char claims that he specifically advised Plaintiff that tooth removal should be the "last resort," Transcript (Tr.) 4/2/91, at 88, but Plaintiff nevertheless chose tooth extraction, the less expensive option. Dr. Char further testified that before proceeding with the extraction procedure, he informed Plaintiff that his buccal plate (a bone near the cheek) was thin, and that Plaintiff could suffer bone loss and the additional extraction of tooth 16 if tooth 15 were removed. Plaintiff, however, told Dr. Char, "You're the doctor. Go ahead and remove it." *Id.* at 49.

On the other hand, Plaintiff testified that although Dr. Char discussed the root canal option with him, Dr. Char also advised him that since tooth 15 was badly decayed, extracting it would be the best alternative.

Plaintiff also insists that he was never advised by Dr. Char of the possible adverse consequences[2] that could result from the extraction of tooth 15. Plaintiff's testimony in this regard was confirmed by the testimony of Dr. Char's two dental assistants, Verna Perreira and Celeste Lacuesta, who both stated that they did not hear Dr. Char inform Plaintiff of any possible problems or complications which could result from an extraction. Further, although Dr. Char testified that he advised Plaintiff that bone loss and removal of tooth 16 could result from the extraction of tooth 15, there is no evidence that Dr. Char explained to Plaintiff the possible adverse consequences of bone loss and tooth removal.[3]

After anesthetizing the area of extraction, Dr. Char began to remove Plaintiff's tooth 15. While loosening the tooth, Dr. Char felt something crack, and Plaintiff heard a loud sound. At the moment of the actual extraction, Plaintiff was "shocked" to see removed from his mouth "two teeth with the bone, and some meat and stuff hanging off of it." Tr. 4/2/91, at 177. This occurrence resulted because tooth 15, tooth 16, and a segment of Plaintiff's buccal plate and antrum bone[4] were ankylosed, or fused, together. The extraction left Plaintiff with a dime-sized hole leading from his mouth to his sinus cavity, causing blood to flow to his nose.

After the extraction, Dr. Char seemed surprised and upset with the result of the procedure. He packed and sutured the area and gave Plaintiff some painkiller (Percodan) tablets and herbal remedies. Dr. Char also gave Plaintiff various post-operative instructions, which included the following: no smok-

1. A "root canal" is the slender channel in the center of the root of a tooth which contains the nerve and blood vessels of the tooth. 4 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* R–132 (1994). At trial, Richard Fischer, D.D.S. (Dr. Fischer) testified that a root canal procedure "basically involves remov[ing] the nerve from the tooth so that the tooth can be kept in the mouth without constant infection, pain, and so forth." Transcript (Tr.) 4/4/91, at 21–22. Dr. Fischer stated that because the procedure hollows out the tooth, making it more fragile, it is usually followed by a crown, which is a cap or full coverage of the tooth that helps to restore the integrity of the strength of the tooth.

2. Plaintiff's expert dentist, Dr. Thad Kawakami–Wong, testified that if the hole created by the bone loss and removal of teeth 15 and 16 did not heal completely, the patient could suffer headaches and sinus problems. Tr. 4/3/91, at 25.

3. See footnote 2.

4. "Antrum" is a "normal cavity or hollow in a tissue, especially in a bone.... When not otherwise specified, the term antrum usually refers to the cavity on either side of the upper jaw bone, also known as the *maxillary antrum* or *sinus*." 1 J.E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* A–315 (1994).

ing, no taking painkiller tablets on an empty stomach, no blowing through his nose, using pressure packs made of tea bags if bleeding resumed, no rinsing his mouth until the next day, and eating soft foods. Plaintiff left Dr. Char's office sometime between 3:00 and 4:00 p.m.

About 6:30 that evening, Plaintiff's father called Dr. Char to inform him that Plaintiff was still bleeding. Dr. Char advised putting wet tea bags and pressure on the wound to promote clotting. About a half hour later, Plaintiff's fiancée, Renee Sumile (Renee), called to tell Dr. Char that she was taking Plaintiff to the hospital because of Plaintiff's pain and bleeding. Dr. Char met Plaintiff at the hospital, where Plaintiff was given pain medication and injected with a local anesthetic by the emergency room physician. Dr. Char then took Plaintiff back to his office, where he gave Plaintiff some anti-bleeding pills and brought Plaintiff's bleeding under control.

After Plaintiff returned home, Dr. Char received another call from Renee, who reported that Plaintiff had begun to bleed again. Dr. Char gave Renee instructions on how to stop the bleeding and told her to call him in half an hour if Plaintiff's bleeding persisted. Dr. Char received no further calls that evening. The next morning, Dr. Char called Renee to check on Plaintiff's condition and was informed that Plaintiff's bleeding had stopped the previous night after tea bags had been applied, and Plaintiff was taking his medication and "feeling better." Plaintiff's Exhibit 2.

Plaintiff testified, however, that when he looked into the mirror on the day following the extraction, his face was swollen, both eyes were black and swollen shut, and he "looked like the elephant man." Tr. 4/2/91, at 183. Plaintiff insisted that in accordance with Dr. Char's instructions, he did not smoke for about a week after the surgery. However, Celeste Lacuesta, one of the dental assistants present during the extraction, tes-

tified that she saw Plaintiff smoking immediately after he left Dr. Char's office.

About a week after his extraction, Plaintiff saw several other dentists to seek their opinions about his treatment by Dr. Char. The instant lawsuit was filed several months later.

## II. *PROCEDURAL HISTORY*

Plaintiff's complaint alleged six causes of action against Dr. Char. The only counts relevant to this appeal, however, are: Count I, which alleged that Dr. Char was negligent in the performance of certain dental procedures upon Plaintiff; Count II, which alleged a claim for breach of informed consent; and Count IV, which alleged that Dr. Char was negligent in rendering follow-up care to Plaintiff.[5]

Following a trial commencing on April 1, 1991, the jury returned a special verdict, concluding that Dr. Char was negligent and that his negligence was the legal cause of Plaintiff's injury. The jury also found that Plaintiff was contributorily negligent, but determined that the contributory negligence was not the legal cause of his injury. Finally, the jury awarded Plaintiff special damages of $400 and general damages of $56,000. Pursuant to the jury's verdict, the trial court entered judgment in favor of Plaintiff and against Dr. Char on June 26, 1991.

On July 3, 1991, Dr. Char filed a "Motion for Remittitur, or in the Alternative, Motion for a New Trial." On September 17, 1991, the court entered an order granting Dr. Char's motion for remittitur but denying his motion for a new trial. The order stated that "Plaintiff has agreed to remit all damages in excess of $35,000, and has agreed to the entry of judgment in that amount." The order was subsequently amended on September 20, 1991 to reflect that Plaintiff would remit all damages in excess of $35,400. An amended judgment in Plaintiff's favor for

5. After the close of his case, Plaintiff voluntarily withdrew Count III, which alleged a breach of fiduciary duty and warranties, and Count V, which alleged that Dr. Char's practice of prescribing herbal compounds was fraudulent, unethical, and constituted a conflict of interest and an unfair and deceptive trade practice. The trial court granted Dr. Char's motion for directed verdict as to Count VI, which alleged that Plaintiff was entitled to punitive damages as a result of Dr. Char's reckless and wanton disregard of Plaintiff's rights, safety, and well-being.

$37,788.30 [6] was subsequently entered on February 25, 1991.

This timely appeal followed.

## III. *DISCUSSION*

### A. *Dr. Char's Entitlement to a New Trial*

■ Plaintiff argues at the outset that when Dr. Char moved in the alternative for either a remittitur or a new trial, and the trial court granted the remittitur request, Dr. Char's motion for new trial became moot, precluding Dr. Char from appealing its denial. We disagree.

■ We recognize that it is a general rule that a *plaintiff* who accepts a remittitur of a portion of a jury verdict deemed excessive by the trial judge, in lieu of undergoing the expense and risks of a new trial, is precluded from appealing the judgment, even if the acceptance of the remittitur was done under protest.[7] Annotation, *Party's Acceptance of Remittitur in Lower Court as Affecting His Right to Complain in Appellate Court as to Amount of Damages for Personal Injury*, 16 A.L.R.3d 1327, § 2, at 1379 (1967); 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2815 (1973 & Supp.1994). In *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977), for example, the United States Supreme Court stated that "[a] line of decisions stretching back to 1889 has firmly established that a plaintiff cannot appeal the propriety of a remittitur order to which he has agreed[,]"

even if the remittitur was accepted "under protest." *Id.* at 649, 97 S.Ct. at 836.

However, where a *defendant* moves alternatively for a remittitur or a new trial and is thereafter granted a remittitur, courts have generally refused to bar the defendant from thereafter appealing the judgment of remittitur.

In *Garden City Country Club v. Commercial Turf Irrigation, Inc.*, 230 Kan. 272, 634 P.2d 1067 (1981), for example, the Kansas Supreme Court concluded that "where a verdict is reduced and judgment entered for the residue on motion of the party against whom the verdict was entered, said party has neither consented to nor acquiesced in the new judgment, and is not barred from appeal." *Id.* at 275, 634 P.2d at 1070 (overruling *Anstaett v. Christesen*, 192 Kan. 572, 389 P.2d 773 (1964), and *Hawkins v. Wilson*,[8] 174 Kan. 602, 257 P.2d 1110 (1953)).

Similarly, in *Kroger Co. v. Standard*, 283 Ark. 44, 670 S.W.2d 803 (1984), the supreme court of Arkansas concluded that even though a defendant may have previously moved in the alternative that a judgment against him be reduced or that he be granted a new trial, it was "fairer" in such situations to allow a defendant to appeal. The court expressly declined to extend to defendants the general rule applicable to plaintiffs that acceptance of a remittitur in lieu of a new trial bars an appeal. The court stated, however, that "when the defendant appeals, the plaintiff will be allowed to file a cross-appeal." *Id.* at 47, 670 S.W.2d at 805.

---

6. This figure included $2,388.30, which had been awarded to Plaintiff for his costs.

7. This rule has been criticized as being unfair to a plaintiff, Note, *Remittitur Practice in the Federal Courts*, 76 Colum.L.Rev. 299 (1976); Note, *Appealability of Judgments Entered Pursuant to Remittiturs in Federal Courts*, 1975 Duke L.J. 1150 (1975), and some states have, by statute, court rule, or case law, permitted a plaintiff to appeal a remittitur judgment under certain circumstances, e.g., when the plaintiff agrees to the remittitur under protest. Annotation, *Comment Note—Party's Acceptance of Remittitur in Lower Court as Affecting His Right to Complain in Appellate Court as to Amount of Damages for Personal Injury*, 16 A.L.R. 1327 (1967).

8. In *Hawkins v. Wilson*, 174 Kan. 602, 257 P.2d 1110 (1953), the defendant filed a motion requesting that the trial court reduce the amount of

an adverse jury verdict and render judgment for the residue, or grant a new trial. In response, the trial court issued an order that the defendant's motion for new trial "will be sustained unless plaintiff accepts a remittitur in the amount of $6,000.00 and files such acceptance with the clerk of the court within ten days from June 2, 1952[.]" The plaintiff accepted the remittitur, a judgment for the reduced amount was entered, and defendant's motion for new trial was denied, whereupon the defendant appealed. The Kansas Supreme Court, after citing various well-established rules, held that the defendant, by his own conduct and action, had acquiesced in, agreed to, and invited the trial court's ruling, and was therefore precluded from maintaining the appeal. *Id.* at 604, 257 P.2d at 1112–13.

In the present case, Dr. Char did not appeal the amount of the remittitur.[9] Furthermore, it is clear from the record that although his motion was titled in the alternative, Dr. Char was actually seeking both a remittitur and a new trial. Since his motion for a new trial was denied by the trial court, we conclude that Dr. Char has a right to appeal such denial.

### B. The Historical Development of the Doctrine of Informed Consent

■ Traditionally, medical malpractice cases have been predicated on the negligent failure of a physician or surgeon [10] to exercise the requisite degree of skill and care in treating or operating on a patient. 61 Am. Jur.2d *Physicians, Surgeons, and Other Healers* § 174, at 305 (1981) (hereafter "61 Am.Jur.2d *Physicians, etc.*"). As with other negligence actions, the plaintiff in a medical malpractice case based on negligent treatment has the burden of establishing a duty owed by the defendant to the plaintiff, a breach of that duty, and a causal relationship between the breach and the injury suffered. 4 F. Lane, *Lane Medical Litigation Guide* § 40.14, at 54 (1993). However, unlike the ordinary negligence case, it is the general rule that a malpractice case based on negligent treatment cannot be established without expert medical testimony to support it:

> [I]n the ordinary negligence case the jury can determine whether there has been a breach of defendant's duty to the plaintiff on the basis of their everyday experience, observations and judgment. The ordinary negligence case will not require expert opinion evidence to delineate acceptable from unacceptable standards of care. However, in the medical negligence case,

lay jurors are ill prepared to evaluate complicated technical data for the purpose of determining whether professional conduct conformed to a reasonable standard of care and whether there is a causal relationship between the violation of a duty and an injury to the patient. *Therefore, expert opinion evidence is generally required to aid the jury in its tasks.*

*Id.* (emphasis added). *See, e.g., Devine v. Queen's Medical Center,* 59 Haw. 50, 52, 574 P.2d 1352, 1353 (1978).

■ Moreover, it is generally not sufficient for a plaintiff's expert witness (i.e., one qualified in medicine, or dentistry, as the case may be) to testify as to what he or she would have done in treating a particular patient. 3 F. Harper, F. James, Jr. & O. Gray, *The Law of Torts* § 17.1, at 554–55 (2d ed.1986) (hereafter *"The Law of Torts"*). The expert must go further and state that the defendant's treatment deviated from any of the methods of treatment approved by the standards of the profession. *Id.*

This requirement for expert testimony has significantly affected the substantive law in this area. In view of the well-known reluctance of physicians to testify against each other, the requirement has made it difficult and sometimes impossible for even a plaintiff who has suffered "a real and grievous wrong" to support a claim based on a physician's negligent treatment or surgery. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and Keeton on the Law of Torts* § 32, at 188 (5th ed.1984) (hereafter *"Prosser and Keeton"*). It has also been often pointed out that the requirement gives the medical profession "the privilege, which is usually emphatically denied to other groups, of set-

---

**9.** Based on the facts in this case, we do not believe that Dr. Char would have been precluded from appealing the amount of the remittitur judgment even if he had chosen to do so. At the hearing on Dr. Char's motion, his attorney argued that the judgment should be reduced to $25,000. Since the trial court reduced the judgment to $35,400 and did not ask Dr. Char to consent to the higher amount, it would not seem fair to estop Dr. Char from appealing the higher amount.

**10.** Most medical negligence cases have involved physicians or surgeons. However, as Professor

Prosser points out, the principles developed in these cases undoubtedly apply to "dentists, pharmacists, psychiatrists, veterinarians, lawyers, architects and engineers, accountants, abstractors of title, and many other professions and skilled trades." W. Page Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts* § 32, at 185–86 (5th ed. 1984). For the sake of convenience, we will generally refer to either "physicians or surgeons" or "physicians" in discussing medical negligence principles in this opinion. However, the principles will be equally applicable to dentists.

ting their own legal standards of conduct, merely by adopting their own practices." *Id.* at 189.

■ About three decades ago, a medical negligence cause of action based on the doctrine of informed consent began to develop rapidly in this country. Under this theory of negligence, even a physician or surgeon who skillfully treats or operates on a patient may nevertheless be held liable for adverse consequences to the patient if: (1) the physician performs the treatment or operation without or beyond the scope of the patient's consent, or (2) the physician fails to inform the patient of the risks of a particular treatment or operation so that the patient can decide whether he or she is willing to undergo the treatment or operation. *Id.* at 189–90.

The informed consent doctrine is based on principles of individual autonomy, and specifically on the premise that every person has the right to determine what shall be done to his own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment or surgical procedure. Such a disclosure should include the nature of the pertinent ailment or condition, the risks of the proposed treatment or procedure, and the risks of any alternative methods of treatment, including the risks of failing to undergo any treatment at all.

*Id.* at 190.

The Hawai'i Supreme Court first recognized in *Nishi v. Hartwell,* 52 Haw. 188, 473 P.2d 116 (1970), that the doctrine of informed consent could be the basis of a medical negligence tort action. In that case, the plaintiff, Dr. Nishi, was a dentist who became paralyzed after undergoing thoracic aortography, a diagnostic surgical procedure recommended to him by Dr. Alfred Hartwell, a cardiovascular specialist, and performed by Dr. Niall Scully, a thoracic surgeon. Both physicians recognized that paralysis was a known risk of the surgical procedure. However, because Dr. Nishi suffered from hypertension and severe pain and was highly apprehensive and frightened about his condi-

tion, both physicians feared that disclosure of the possible side effects of the surgical procedure might adversely affect Dr. Nishi's health. Consequently, neither physician advised Dr. Nishi of the possible risks.

Dr. Nishi later sued both physicians on a theory of battery, contending that their failure to disclose the potential risks had vitiated his consent to the surgical procedure and therefore constituted an unlawful touching of his body. After the circuit court dismissed the action against the physicians, Dr. Nishi appealed.

The Hawai'i Supreme Court initially rejected Dr. Nishi's battery claim, concluding that Dr. Nishi could not have been unlawfully touched since he had specifically consented to the nature and scope of the surgical procedure. *Id.* at 190–91, 473 P.2d at 118–19.

The supreme court went on to hold, however, that because Dr. Nishi had not been advised of the collateral hazards of the surgery, he did have a cause of action against the physicians in negligence, based on the doctrine of informed consent. *Id.* at 191, 473 P.2d at 119. According to the supreme court:

The doctrine of informed consent imposes upon a physician a duty to disclose to his patient all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information.

However, the doctrine recognizes that the primary duty of a physician is to do what is best for his patient and that a physician may withhold disclosure of information regarding any untoward consequences of a treatment where full disclosure will be detrimental to the patient's total care and best interest.

*Id.* (citations omitted).

The supreme court declined to adopt a hard and fast rule regarding the circumstances which would excuse a physician for withholding full disclosure from a patient and the kind of information that might be withheld. *Id.* at 191–92, 473 P.2d at 119. Quoting with approval from *Watson v. Clutts,* 262

N.C. 153, 136 S.E.2d 617 (1964), however, the court held that a " 'doctor's primary duty is to do what is best for the patient,' " and " '[a]ny conflict between this duty and that of a frightening disclosure ordinarily should be resolved in favor of the primary duty.' " *Nishi*, 52 Haw. at 192, 473 P.2d at 119.

In view of the uncontradicted evidence that disclosure of the risks would have been frightening and harmful to Dr. Nishi, the supreme court concluded that the defendant physicians clearly fell within the therapeutic privilege exception to the duty of full disclosure, and were therefore properly dismissed from the lawsuit. *Id.*

The supreme court also affirmed the dismissal on another ground. The supreme court observed that in cases involving a physician's liability to a patient for nondisclosure of collateral risks, most courts require "the question to be decided by reference to relevant medical standards and imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony." *Id.* at 195–96, 473 P.2d at 121. Because the two physicians, in their testimony, claimed that their nondisclosure of the risks to Dr. Nishi was justified by their therapeutic privilege, and because Dr. Nishi had failed to adduce any expert medical testimony regarding the medical standard of disclosure which the two physicians had breached, the supreme court concluded that no liability on the part of the physicians had been established. *Id.* at 196–97, 473 P.2d at 121.

Subsequently, in *Leyson v. Steuermann*, 5 Haw.App. 504, 705 P.2d 37 (1985), this court, in dicta,[11] examined the doctrine of informed consent as outlined by the supreme court in *Nishi*. We initially pointed out that the standards set forth in *Nishi* regarding a physician's duty of disclosure appeared to be contradictory.

On the one hand, the supreme court recognized a clear duty on the part of a physician to disclose to his or her patient "all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to

the treatment would be an intelligent one based on complete information." *Nishi*, 52 Haw. at 191, 473 P.2d at 119. The supreme court thus seemed to establish a precise and definite duty on the part of physicians to disclose to their patients whatever information their patients would find significant in making informed choices.

On the other hand, the supreme court absolved the two physicians of liability because Dr. Nishi had not adduced any expert medical testimony that it was the accepted medical practice to disclose the risk of paralysis to a patient in Dr. Nishi's situation. *Id.* The supreme court thus seemed to imply that the duty imposed on physicians was to comply with relevant medical standards of disclosure.

We did not, in *Leyson*, resolve the ambiguity as to whether a physician's duty of disclosure should be measured from the physician's or patient's perspective. However, we did recognize that a physician clearly has no duty of disclosure where: (1) the risks are unforeseen or immaterial; (2) the disclosure is precluded by an emergency situation; (3) the disclosure is precluded by the patient's incapacity; (4) the patient has waived his or her right to receive the information; (5) the disclosure would be harmful to the patient, so that the doctor has a "therapeutic privilege" to withhold information; or (6) the risk is commonly understood, obvious, or already known to the patient. *Leyson*, 5 Haw.App. at 513–14, 705 P.2d at 45 (citing *Prosser and Keeton* § 32, at 192).

We also pointed out that a defendant-physician who relies on any of the exceptions to the duty of disclosure in a particular case bears the initial burden of producing evidence of such exception. If and when the physician meets this initial burden, however, the patient has the ultimate burden of proving the nonexistence of the exception. *Id.* at 514, 705 P.2d at 45.

Finally, we articulated five material elements which must be proved in order to establish a medical tort claim based on the

11. *Leyson v. Steuermann*, 5 Haw.App. 504, 705 P.2d 37 (1985), was decided on procedural grounds. Therefore, although this court examined the underpinnings of the doctrine of informed consent, our discussion was dicta.

doctrine of informed consent. *Id.* at 516–17, 705 P.2d at 46–47. Referring to these elements in *Mroczkowski v. Straub Clinic & Hosp., Inc.*, 6 Haw.App. 563, 732 P.2d 1255 (1987), we restated them as follows:

> (1) the physician owed a duty to disclose to the patient prior to treatment the risk of the harm suffered by the patient; (2) the physician negligently performed or failed to perform his or her duty of disclosure; (3) the patient suffered the harm; (4) the physician's negligent performance or non-performance of duty was a cause of the patient's harm in that: (a) the physician's treatment was a substantial factor in bringing about the patient's harm and (b) the patient, acting rationally and reasonably, would not have-undergone the treatment had he or she been properly informed of the risk of the harm that in fact occurred[;] and (5) no other cause is a superseding cause.

*Id.* at 566, 732 P.2d at 1257.[12]

### C. *Dr. Char's Motion for Directed Verdict as to the Informed Consent Count of the Complaint*

At the close of Plaintiff's case, Dr. Char moved for a directed verdict, contending that Plaintiff had failed, in two respects, to establish the requisite elements of a negligence claim based on informed consent.

First, according to Dr. Char, Plaintiff failed to produce any expert testimony, as required by *Nishi*, to establish element 1, the existence and scope of a dentist's duty to inform a patient of the risks of a tooth extraction. Dr. Char points out that although he and another dentist, Dr. Thad Kawakami–Wong (Dr. Kawakami–Wong), both testified during Plaintiff's case in chief, neither was questioned about what a competent and reasonable dentist would have disclosed to a patient in Plaintiff's situation. Furthermore, although Dr. Kawakami–Wong opined that to "a reasonable degree of dental probability,"

Dr. Char's treatment and care of Plaintiff was "below the standard of practice among dentists with similar training and experience in this community," Tr. 4/3/91, at 9–10, 17, his sole testimony as to informed consent established only what he personally would have disclosed to a patient in Plaintiff's situation and not what other reasonable dentists would have disclosed:

> Q Now, if as we had just discussed there were some teeth that were ankylosed and there was a thin buccal bone and you had discovered this prior to—strike that. If you suspected that there might be ankylosed teeth and a thin buccal bone prior to performing the extraction proceeding, would you have informed your client of those facts and what could happen if the proceeding took place.
>
> A Yes, I definitely would have.

*Id.* at 17.

Dr. Char additionally maintained that because Plaintiff failed to testify that he would have chosen a different course of treatment if he had been advised by Dr. Char of the potential risks of the extraction, element 4(b), the causation element of the *Leyson* test, was never established.

We disagree with Dr. Char that elements 1 and 4(b) were not sufficiently established by Plaintiff.

### D. *Element 1: The Duty of Disclosure*

 Although it is now fairly well-settled that a physician owes a duty to a patient to disclose sufficient information about a proposed course of treatment or surgical procedure so that the patient can make an informed and intelligent decision about whether to submit to the treatment or surgical procedure, there is substantial disagreement among the different jurisdictions as to how the physician's duty should be measured. Courts generally use one of two basic standards: (1) the professional medical standard,

---

12. In *Mroczkowski v. Straub Clinic & Hosp., Inc.*, 6 Haw.App. 563, 732 P.2d 1255 (1987), and subsequently in *Keomaka v. Zakaib*, 8 Haw.App. 518, 811 P.2d 478 (1991), this court continued its development of the doctrine of informed consent in light of legislation creating a statutory medical tort for the rendering of professional services without informed consent. *See* Hawai'i Revised Statutes ch. 671 (1985 & Supp.1992). Both parties in this case concede, however, that the statutory medical tort is not applicable to dentists and, therefore, Plaintiff's breach of informed consent claim against Dr. Char is based on common law.

or (2) the patient standard. Note, *Leyson v. Steuermann: Is There Plain Error in Hawaii's Doctrine of Informed Consent?*, 8 U.Haw.L.Rev. 569, 582 (1986) (hereafter "Note, 8 U.Haw.L.Rev.").

The professional medical standard applies customary medical practice as its standard of disclosure. Under this standard, a physician is not required to inform a patient of the types of risks that may result from a particular treatment or surgery unless a reasonable physician would make the disclosure under the same or similar circumstances. *Prosser and Keeton* § 32, at 191.

> Proponents of the ... professional standard of care assert that only a physician is capable of estimating the potential psychological impact that risk disclosure would have on a particular patient. They maintain that in deciding whether and how much to disclose prior to treatment, a medical practitioner must consider the state of his patient's health, the condition of his heart and nervous system, his mental state, and whether the risks involved are mere remote possibilities or hazards which occur with appreciable regularity. Furthermore, it is argued, to hold physicians to a general or lay standard of care with respect to disclosure would interfere with the flexibility a doctor must have in determining what therapy would best suit his patient's needs.

61 Am.Jur.2d *Physicians, etc.* § 188, at 319–20.

The patient standard of care, which has been growing in acceptance in recent years, requires a physician to disclose to a patient all risks, alternatives, and other information that the patient would find significant in making a decision to receive treatment or undergo surgery. Note, 8 U.Haw.L.Rev. at 583. Courts which apply this standard "emphasize what the patient needs to know to make an informed decision, rather than what the medical community thinks the patient should be told." *Id.* Proponents of this standard argue that

> [s]uch a standard provides the patient with effective protection against a possible conspiracy of silence wherever it may exist among physicians. Moreover, since the

patient must suffer the consequences, and since he or she bears all the expenses of the medical treatment, fundamental fairness requires that the patient be allowed to know what risks a proposed treatment entails, what the alternatives thereto are and the relative probabilities of success.

61 Am.Jur.2d *Physicians, etc.* § 190, at 321. *See also* Annotation, *Modern Status of Views as to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment* 88 A.L.R.3d (hereafter "Annot., 88 A.L.R.3d") § 3, at 1017 (1979).

In *Nishi v. Hartwell, supra,* the Hawai'i Supreme Court seemingly embraced both the patient and professional standards in measuring a physician's duty of disclosure under the doctrine of informed consent. The court appears to have adopted the patient standard when it stated that the physician's duty is "to disclose to his patient all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information." 52 Haw. at 191, 473 P.2d at 119. However, it also apparently applied the physician's standard when it held that the question of the physicians' liability for negligent nondisclosure of risks must "be decided by reference to relevant medical standards" and that the plaintiff bears "the burden of proving the applicable standard by expert medical testimony." *Id.* at 195, 473 P.2d at 121.

In *Leyson, supra,* this court pointed out that the *Nishi* court's description of the doctrine of informed consent as a "precise and definite duty" and alternatively as a "duty to comply with relevant medical standards" appeared to be contradictory. 5 Haw.App. at 513, 705 P.2d at 44–45. It is possible, however, to read *Nishi* as being without contradiction.

*Nishi* was a nondisclosure case based on a recognized exception to the duty to disclose. Dr. Nishi's physicians readily admitted that they had not disclosed the risks of paralysis to Dr. Nishi. However, they justified their nondisclosure on the basis of the therapeutic privilege exception to the duty of disclosure,

contending that in their professional medical judgment, full disclosure of the potential risks would have been harmful to Dr. Nishi's health. Since their nondisclosure was based on the exercise of their professional medical judgment as to what was best for Dr. Nishi, the supreme court understandably applied the physician standard, requiring Dr. Nishi to adduce expert medical testimony that such nondisclosure by the physicians did not conform to the reasonable practices of competent and responsible medical practitioners in the same situation. *Nishi*, 52 Haw. at 195, 473 P.2d at 121.

In this case, Dr. Char has not claimed that the therapeutic privilege exception applies so as to justify the nondisclosure of risks to Plaintiff. Rather, his defense at trial was that he had complied with the duty and had expressly informed Plaintiff of the risks of and alternatives to a tooth extraction. Since Dr. Char has conceded that a duty of disclosure existed, the relevant issue is whether such duty is to be measured by the physician standard or the patient standard.

In *Nishi*, the supreme court stated that a physician owes a duty to disclose "all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information." *Id.* at 191, 473 P.2d at 119. Because the focus of this duty is on what information a patient needs in order to make an intelligent decision regarding a course of treatment, we conclude that the patient standard applies.[13] Under the patient standard, expert testimony is not critical to demonstrate the amount of information a patient needs in order to intelligently decide between two treatment options. The decision as to what procedure to undergo is ultimately the patient's; to impose a standard of disclosure dictated by experts

would be to undermine the decision-making power of patients in similar situations. Therefore, in proving the element of duty for informed consent purposes, a patient is not required to produce any expert medical testimony regarding what other reasonable dentists would have disclosed under the same or similar circumstances.

The application of the physician standard in nondisclosure cases based on the therapeutic privilege exception and the patient standard in cases where the duty of disclosure clearly applies is consistent with the underlying foundation upon which the doctrine of informed consent is premised. As Professors Harper, James, and Gray explain:

> The cornerstone of this doctrine is the notion that persons (at least if they are under no legally recognized disability) have the right to decide what treatment they will undergo and what risks they are willing to undertake in the process. In order to make this choice meaningfully the patient must know the alternative risks—at least in their larger outlines—and it is the doctor's duty to apprise him of them since the doctor is in a peculiarly favorable position to know them and has a relationship of trust and confidence with the patient.
>
> If, then, the patient suffers a bad result from treatment, he may have an action on this account if the doctor should have told him of the risk of this result and failed to do so (if the patient would have foregone the treatment had he known the risk) even though the patient cannot show the doctor's negligence in causing the result. This basis of liability makes it unnecessary, therefore, for the patient to adduce expert evidence of the doctor's negligence in treatment.

The doctrine of informed consent will not always, however, obviate the relevance

---

**13.** Recently, in *Craft v. Peebles*, 78 Hawai'i 287, 893 P.2d 138 (1995), the Hawai'i Supreme Court affirmed a partial summary judgment in favor of a physician in an informed consent cause of action. The court held that the jury was properly instructed that a plaintiff who brings "an action based on informed consent must establish the applicable standard of care through expert medical testimony [and] [m]anufacturer's package inserts do not, by themselves, set the stan-

dard of care which is applicable to a physician on the issue of informed consent." *Id.* at 306, 893 P.2d at 157. We do not disagree that the standard of care must be established by expert medical testimony. However, in informed consent cases, the standard of disclosure, rather than the standard of care, is at issue. We therefore do not construe *Craft* as requiring expert medical testimony in establishing a physician's duty of disclosure.

of expert medical testimony. Clearly it will not in every case be in the patient's own best interest to be told all the bad results that might possibly attend a course of treatment. Some patients are so likely to exaggerate their fears out of all proportion to reality that their power of free choice will be destroyed rather than informed; some are likely to be unreasonably deterred from treatment they desperately need. As a California court said in what has become a leading case, after stating the doctor's duty to disclose risks, "At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient's mental and emotional condition is important and in some cases may be crucial, and that . in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent."

Since the courts quite rightly recognize room for a doctor's therapeutic discretion in exercising the duty of disclosure, expert evidence of what is proper medical practice in that respect is relevant and is everywhere received. This is as it should be. But a good number of courts have gone much further and have *required* medical evidence that it is customary professional practice to make the disclosure in question before a jury may find a doctor negligent in failing to make it, even where the treatment was an "elective" one presenting no emergency. Such requirement in these circumstances is, it is submitted, an unwarranted abdication of responsibility and of the individual's right to make an informed choice, to the medical profession.

*The Law of Torts* § 17.1, at 558–60 (footnotes omitted, emphasis in original).

■ Our conclusion today should not be construed to mean that expert testimony may be dispensed with entirely in informed consent cases. Expert testimony will still be "required to establish the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, [and] the nature of available alternatives . to treatment[.]" *Sard v. Hardy*, 281 Md. 432, 448, 379 A.2d 1014, 1024 (1977). Further, as we have already indicated, expert testimony as to the proper medical standards of disclosure will be required where a physician justifies his or her nondisclosure of risks to a patient on the basis of the therapeutic privilege exception.

### E. *Element 4(b): Causation*

■ All courts that recognize medical negligence claims based on the doctrine of informed consent require proof of proximate causation. 61 Am.Jur.2d *Physicians, etc.* § 196, at 329. A plaintiff therefore cannot recover under the doctrine unless he can prove by a preponderance of the evidence that. he would not have consented to a proposed course of treatment had he known of the risk of the harm that in fact occurred. *Prosser and Keeton* § 32, at 191.

A divergence of views exists, however, as to the appropriate standard to be applied in determining proximate causation in informed consent cases.

Some courts have adopted the subjective standard, which views causation from the particular patient's perspective. Note, 8 U.Haw.L.Rev. at 585. Causation exists under this standard only if the *particular plaintiff* would have foregone treatment had he or she been fully advised of the risks. *Id.* Consequently, in order to establish causation under the subjective standard, a plaintiff must testify that he or she would have foregone treatment if fully informed of the risks, *Hammer v. Mount Sinai Hosp.*, 25 Conn. App. 702, 712, 596 A.2d 1318, 1325 *cert. denied*, 220 Conn. 933, 599 A.2d 384 (1991), and proof of causation ultimately turns on the

credibility of the plaintiff. *Id.* Courts which use the subjective test believe that it better protects the essential values that underlie the informed consent doctrine. *McPherson v. Ellis,* 305 N.C. 266, 287 S.E.2d 892 (1982); *Scott v. Bradford,* 606 P.2d 554 (Okla.1979). However, critics of this approach point out that it puts the physician in " 'jeopardy of the patient's hindsight and bitterness,' " *Sard v. Hardy,* 281 Md. 432, 449, 379 A.2d 1014, 1025 (1977) (quoting *Canterbury v. Spence,* 464 F.2d [772], at 790–91 (D.C.Cir.), [*cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518] (1972)), and bars recovery by a patient who dies as a result of the unforewarned collateral consequence. *Id.*

The majority of jurisdictions use an objective standard in assessing proximate causation, permitting liability only if a reasonable person would have withheld consent to a treatment or procedure had full disclosure of the material risks been made. 4 S. Speiser, C. Krause & A. Gans, *The American Law of Torts* § 15:73, at 658 (1987). Under this standard, the physician is less subject to a disgruntled patient's obvious bias in testifying in hindsight or disillusionment following unsuccessful treatment. Note, 8 U.Haw. L.Rev. at 585. Furthermore, because no deference is given to the credibility of the particular plaintiff, the plaintiff is not required to affirmatively testify that he would have foregone treatment if he had been informed of the material risks. *Hartke v. McKelway,* 707 F.2d 1544, 1551 (D.C.Cir.1983) *cert. denied,* 464 U.S. 983, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983); *Sard v. Hardy,* 281 Md. at 449, 379 A.2d at 1025 (1977).

In *Leyson v. Steuermann, supra,* this court opted to apply a "modified objective standard" that determines causation "from the viewpoint of the actual patient acting rationally and reasonably." 5 Haw.App. at 517 n. 10, 705 P.2d at 47 n. 10. As pointed out by the authors of *Prosser and Keeton,* this approach is a reasonable compromise between the subjective and objective standards, both of which have their disadvantages:

> As a compromise, an objective-subjective mix might reasonably be adopted, substituting an "ordinary" patient for the "reasonable" one, and taking account of the patient's individual fears and beliefs in considering "the patient's position." Such an approach would maintain a basically objective structure for the issue, leaving it capable of reasoned adjudication, yet would also protect the basic individuality and autonomy of idiosyncratic patients who are in fact injured by insufficient disclosure.

*Prosser and Keeton* § 32, at 192.

Because the modified objective test maintains a basically objective structure, a plaintiff seeking to establish causation is not required to testify that he or she would have foregone treatment if disclosure of the risks had been made. However, in order to avoid a directed verdict against him or her, the plaintiff must adduce evidence to support a finding that the plaintiff, acting rationally and reasonably, would have withheld consent to a proposed course of treatment or surgery if properly advised of the risks.

In this case, the evidence revealed that when Plaintiff visited Dr. Char's office on the occasion in question, he was in excruciating pain and wanted to be put out of his misery. Because he was unemployed and had no dental insurance, he opted to have his decayed tooth extracted rather than undergo the more expensive root canal procedure which Dr. Char had recommended. The record is unclear what the cost difference was between the two procedures, but at oral argument, both attorneys indicated it was about $200. Based on the record, there was clearly sufficient evidence, under the modified objective test, for a jury to find that, had Plaintiff been advised of the risks of tooth extraction, he would, if he had been acting rationally and reasonably, have chosen to undergo the more expensive but much less risky root canal procedure which Dr. Char had recommended. There was thus sufficient evidence of the element of causation to preclude a directed verdict in Dr. Char's favor.

## IV. CONCLUSION

Based on the foregoing discussion, we hereby affirm the judgments and orders from which this appeal was taken.